THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SUSAN E. DAVIDSON, Defendant-Appellant.

Fifth District    No. 5—85—0211

Opinion filed September 9, 1987.

Donald E. Groshong and G. Edward Moorman, both of Groshong & Moorman, Ltd., of East Alton, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Mark L. Rotert and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Susan E. Davidson, was charged by information with murder under the accountability theory, solicitation to commit murder and conspiracy to commit murder. A jury in the circuit court of Madison County found her guilty of all three offenses. The trial court entered convictions on the three guilty verdicts and sentenced defendant to concurrent prison terms of 30 years for murder and 20 years for solicitation, but did not enter sentence on the conspiracy conviction. Defendant contends on appeal (1) the court erred in failing to instruct the jury on self-defense and voluntary manslaughter, (2) defendant was placed in jeopardy twice for the same offense, (3) defendant's equal protection and due process rights were violated, (4) the court erred in failing to remove the prosecutor from the case, (5) the court erred in failing to suppress various documents allegedly written by defendant, (6) the court erred in denying defendant the opportunity to attack the credibility of a defense witness, (7) the State failed to properly allege and prove the offense of solicitation, (8) the State failed to properly allege and prove the offense of conspiracy, (9) the court erred in failing to exclude handwriting exemplars offered by the State, and (10) the court erred in admitting hearsay evidence. For the reasons which follow, we vacate defendant's convictions for solicitation and conspiracy but affirm the conviction and sentence for murder.

The State's evidence showed that defendant was in the midst of an affair with a man named William Gill, that defendant and Gill planned the murder of defendant's husband, Stephen Davidson, and that Gill killed Stephen Davidson on the night of October 31, 1979. There was no effort to prove defendant was at home when her husband was murdered. Gill, in a separate trial prior to defendant's trial, was convicted of voluntary manslaughter, a conviction this court affirmed on appeal. *People v. Gill* (1982), 106 Ill. App. 3d 1164 (unpublished Rule 23 order).

Police were called to the home of Stephen and Susan Davidson in Godfrey, Illinois, on the night of October 31, 1979, and upon investigation found the body of Stephen Davidson on the floor in a room in the basement of the home. The victim's head, hands and clothes were heavily stained with blood, and there was blood on a wall and on a couch in the room where the body was discovered. Police also found blood on the inside and outside of a garage door. An autopsy determined that Stephen Davidson died from a gunshot wound to the head.

Ronald Tune, a detective with the Madison County sheriff's department, testified that he questioned defendant on the night of the

murder at the home of one of defendant's neighbors. Defendant told Tune that she and her daughter, Kimberly, left the house at 5:40 p.m. to go to Kimberly's swimming practice. They left the practice at 7:10 p.m. and returned home at 7:40 p.m. Defendant told Tune her husband was watching television when she left the house and that his only plan was to possibly buy some milk at a local grocery store. She denied being involved in any affair. Later that night at the Alton police department, Tune again questioned defendant. At this time defendant stated that she had met Gill during tennis lessons in March of 1979. She and Gill had arranged meetings with each other in their cars two or three times and had kissed, but she denied engaging in sexual relations with him. Tune questioned defendant a third time later that night at the Alton police department. In this third interview, Tune asked whether defendant had had sexual relations with Gill, and defendant replied that she had done so two or three times. Defendant also told Tune that Gill knew she would be at swimming practice that night. Tune testified that defendant told him she made a phone call from the swimming practice to her home to see if her husband wanted food from a certain restaurant for dinner. She made this call at 7 p.m. and received no answer. Defendant denied being involved in her husband's death.

Sergeant Charles Zukas of the Madison County sheriff's department testified that he went to St. Joseph's Hospital in Alton at 10:30 p.m. on October 31 where he spoke with Gill, who appeared to have an injury to his right hand. Gill told Zukas that he was at the parking lot of a movie theater in Granite City when a man with a knife robbed him. Gill stated that the robber cut him on the right hand, then Gill reached for a .38 caliber Colt revolver which he kept under the seat of his car, but the gun was not there.

Jerry Knight, a Madison County sheriff's deputy, testified that on November 1, 1979, he was at a park along the banks of the Mississippi River with other officers. William Gill was also present. Gill picked up a rock and threw it into the river. Police marked the location and dragged the river until, on November 4, authorities found a Colt revolver with a broken hand grip.

Larry Lorsbach, director of the area State Crime Laboratory, testified that the gun found in the river had a wooden grip which was broken, and that three pieces of wood found under and near the body of Stephen Davidson on the night he was murdered came from the gun found in the river. Lorsbach further testified that spent cartridges found at the Davidson home came from the same variety of gun as the one found in the river.

Robert McGarvey testified for the State that he knew William Gill and that he and Gill were "very close." He knew that Gill carried a .38 caliber Colt revolver, and testified that the gun which had been found in the river appeared to be the one owned by Gill. McGarvey testified that in the summer of 1979, Gill began jogging, losing weight, and wearing better clothes, yet was not as sociable as he had been previously. McGarvey further testified that on November 2, 1979, Gill's estranged wife gave him keys to Gill's apartment because Gill had been arrested. McGarvey and McGarvey's wife went to the apartment to collect Gill's clothes and valuables because the apartment was in a "bad neighborhood." In the process of gathering these items, McGarvey accidentally pushed a cushion off of a couch, allowing him to notice a lump in one of the cushions. He unzipped the cushion and found a white plastic bag inside. The bag contained cards and letters. The McGarveys took the bag and its contents home with them. They then went to see defendant at the funeral home where visitation was being held for Stephen Davidson. When they arrived at the funeral home, defendant approached them, the McGarveys introduced themselves to defendant, then told defendant they had found some letters. Defendant appeared relieved. McGarvey then asked her if she knew Gill was going to her house the night of the murder, and defendant responded affirmatively. McGarvey also asked if defendant knew Gill was going to kill her husband, and according to McGarvey, defendant said, "[Y]es but my God it wasn't supposed to happen that way." She told McGarvey that Gill "was supposed to park his car some distance away, jog to the house, go in through an open door, go into the house, knock him out, put him in the trunk of his car and take him out and make him look like he had an accident." McGarvey testified that defendant said, "I didn't mind him being shot but he was beaten." McGarvey further testified that he and his wife gave the cards and letters to Gill's attorney, Russ Meyer.

McGarvey's wife, Karen McGarvey, also testified. In addition to substantially corroborating the testimony of her husband, she stated that defendant came to their home on November 4, 1979, and said she wanted the letters as a last remembrance of Gill, but Karen McGarvey refused to turn them over to defendant.

The State relied heavily upon the cards and letters found in Gill's apartment, which were written by Gill and defendant to each other, to prove defendant's involvement with the murder. In this correspondence, defendant and Gill discussed their secret meetings, expressed love for each other, and discussed plans to marry in the future. Letters from defendant to Gill referred to fears of going to jail, and also

include references to "it" and a "plan," which the State attempted to show were references to the plan to kill Stephen Davidson. The following are excerpts from some of the letters written by defendant to Gill:

"The final outcome of this entire plan is so very important to me, I am very worried that something will go wrong and you and I will get caught."

"When you get back I want you to take a small amount of time to tell me whether your thoughts in regard to whether 'it' will work or not. If not, let's get started on another plan."

"I can see this whole thing blowing up before my face. I will take care of what I need to take care of and low and behold you will be living back at home and somehow she will get her hooks into you and you won't leave. Nice arrangement huh? I will get to spend the rest of my life in jail and you will get to spend the rest of your life with her."

"It then went through my mind that once 'it' is taken care of then the waiting period before we can get married will be like hell."

"Well, the one thing that keeps popping into my mind is that once 'it' is taken care of—then we will have to start casually seeing each other or bumping into each other and then we can start dating and then after dating for awhile then FINALLY we can get married—good God that's a long way off."

"Steve is really hyper now about people breaking in our house. The statement he made about trusting no one anywhere and at any time really got to me last night. I just wonder how anyone will get to him now. He has been so very cautious these last few weeks he really mystifies me."

"In the back of my mind what I am trying to prepare you or prepare me for is the fact that *you* will be able to change your mind and go back to your old life if you decide to or if you want to but the way we have things planned for my end of it there will be no changing of my mind and there will be no turning back or going back to my old life."

"One of my biggest faults is the fact that I care entirely too much about what other people think. And I think that 'afterwards' I will be stared at and put down so badly that if I move to another town where no one knows me that no one will ever figure out what we have done and who we are, etc."

"All of a sudden it dawned on me that our money is going to be a little tight—hopefully, I will have the insurance money but

that will not be able to be used for traveling or current expenses—because I intend to invest that money and only use the interest—and the interest is supposedly supposed to be used to pay my house payment—if it will cover it."

The State also presented evidence of a life insurance policy on the life of Stephen Davidson with a death benefit of $46,000, which doubled to $92,000 in case of accidental death. Defendant was named as beneficiary.

The defense called as its primary witness William Gill. Gill, who was married and had four children, testified he had met defendant in March or April of 1979 while they were both attending the same tennis lessons. On May 2, 1979, a group from the class, including Gill and defendant, went to a local tavern. Upon leaving the tavern, Gill and defendant talked in the parking lot and later kissed. Gill and defendant met after subsequent tennis lessons to talk and began going to lunch together on occasion. Gill further testified he talked by phone with defendant 100 times during May of 1979. They also corresponded by mail, and sometimes he would personally deliver letters to defendant at her place of employment. Gill testified that in mid-May he realized he was in love with defendant and believed she was in love with him. On June 7, 1979, Gill and defendant decided to stop seeing each other because of fears that their relationship might disrupt their families. However, they began seeing each other again the next week. Gill testified that early in their relationship they discussed divorcing their spouses, and that their eventual goal was to marry each other. In mid-August, Gill left his wife, moved out of the family home, and moved into his own apartment because his wife had learned about his relationship with defendant. Gill and defendant saw each other frequently after he moved into the apartment. He testified that in the third week of October, he and defendant broke up again. Defendant later brought him all the letters he had written to her. He put these letters in a white plastic bag behind a cushion on his couch.

On October 31, 1979, Gill called defendant at her office but she did not have time to talk. That day he decided he had to confront Stephen Davidson about a divorce from defendant, so he left his apartment at approximately 5:30 p.m. to go to the Davidson home. Gill, who testified he owned a Colt pistol, took his gun with him, concealing it under his clothes. He testified he took his gun "[b]ecause if he wanted to start something, if he wanted to start a fight then that could be used to keep him away from me while I got away." At another point Gill testified he carried his gun wherever he went. Gill testified he did not go to the Davidson home intending to kill

Stephen. He further testified that defendant had not agreed to have him kill her husband and that defendant did not do anything to aid him to cause harm or kill Stephen or assist in planning entry into the house. He stated that defendant did not even know he was going to confront her husband. Gill drove to a grocery store about a mile from the Davidson home, then jogged the remainder of the distance. He testified he parked at the store partly because he did not want anyone to know he was at the Davidson home. Upon arriving at the house, Gill did not go to the front door, testifying that if Stephen saw him coming, he would "slam the door in my face." Instead, Gill, who had been at the Davidson home on one previous occasion, went to one of two garage doors. He knew this particular door could only be operated manually, while the other door was controlled by a powered garage-door opener. He did not know this manually operated door would be unlocked, but he opened the door, went inside, closed the door behind him, then went through the garage to a door that leads into the basement of the home. The basement is on the same level as the garage. In the garage he picked up a piece of wood from a woodpile but testified he did not know why he did so. He knocked on the door to the basement, and simultaneously tried the knob, found the door to be unlocked, then went inside. Once inside, he noticed he had the piece of wood in his hand, so he threw it on the floor because he did not want Stephen to see him with the wood in his hand. Then Gill noticed Stephen standing at the top of the stairs leading to the main floor. Stephen asked Gill what he was doing there, and Gill responded that he wanted to discuss giving defendant a divorce. Stephen became upset. Gill told him that he and defendant were in love and that defendant wanted a divorce. By that time Stephen was at the bottom of the stairs, Gill backed up into a family room, then Stephen punched Gill in the mouth, and told him he would never give defendant a divorce. Gill fell against a couch, then Stephen jumped on him and a fight ensued, according to Gill. Gill testified that his gun had fallen onto the couch during the fight. Both he and Stephen reached for it and the gun discharged but no one was hit. The fight continued and the gun discharged again. Stephen paused for a moment, then continued the struggle. Gill admitted Stephen was shot with Gill's gun but that both he and Stephen were holding the gun at the time it went off. Gill finally obtained exclusive control of the gun, then began striking Stephen on the head with it. He also grabbed a piece of wood from the floor and struck Stephen with it until he stopped fighting. Gill took the gun and left the house following the same path by which he entered. He noticed that his right hand was bloody. He drove to the

banks of the Mississippi River and threw the gun and his clothes into the river. He then drove to a hardware store in Granite City and went to the restroom, where he washed the wound on his hand. Next, he went to a drugstore to get medication and a bandage. He then drove back to his apartment, and later went to St. Joseph's Hospital in Alton. He admitted that while he was there he told Officer Zukas a false story about being robbed.

Gill further testified that at the time of trial he was still in love with defendant and that defendant said she was still in love with him. Gill stated that defendant had told him she would not be home on the evening of October 31, but he testified that defendant had not given him permission to enter the house that night. He also testified he knew Stephen would be upset when he confronted him. On cross-examination, the prosecutor asked Gill, "Well, you took a gun because you knew he would be upset so you thought about it, didn't you?" Gill replied, "I suppose." Gill admitted that he entered the home without permission and entered with a deadly weapon.

Gill also testified regarding the cards and letters found in his apartment. On cross-examination, Gill admitted that defendant had written to him often and that he placed these cards and letters in a bag inside a cushion. The prosecutor asked: "So if a piece of paper came out of the white garbage bag found in your apartment the jury is entitled to assume that either you wrote it or Mrs. Davidson wrote it. Is that right?" Gill responded, "I suppose." He was also asked about some typewritten letters found with the other correspondence: "So then we can also tell the jury that if a piece of paper came out of that white garbage bag and it was typed it must have been authored by Mrs. Davidson. Is that fair to say?" To this Gill also answered, "I suppose, yes." While admitting the existence of this correspondence, Gill's testimony placed an innocent construction on its contents. For example, he testified that references to "it" were simply references to a divorce and nothing more.

The defense also presented the testimony of Kimberly Davidson, the Davidsons' daughter who was 16 years old at the time of trial. Kimberly testified that on October 31, 1979, she came home from school at 3:30 p.m. She opened the manually operated garage door, got a house key from a box in the garage, then unlocked the door to the house. She stated that one garage door is manually operated, while a second door is controlled by a powered opener. Kimberly testified it was the family's practice to leave the manually operated garage door unlocked so she could get to the key to let herself in if her parents were not home. On this day, her father came home at approxi-

mately 5 p.m. and her mother arrived at approximately 5:15 p.m. Kimberly and her mother later left for swimming practice. While at the practice, Kimberly saw her mother on the telephone, but did not see her talking into the phone. Kimberly and her mother stopped at a fast-food restaurant after the practice, and returned home between 7:30 and 7:45 p.m. When they got home, defendant went into the garage and unlocked the door to the house, then turned to Kimberly, asked her why a pair of glasses would be on the floor, then started screaming and crying. Defendant and Kimberly then went to three houses in the neighborhood to get help, but when they could get no response, they returned home. Defendant attempted to call an ambulance but the phone number for the ambulance service had been changed so she called Kimberly's grandfather, Harold Davidson. Kimberly further testified that at the funeral home during visitation for her father, her mother was upset and crying, and that she told two people in blue jeans to "get out of here."

The jury returned verdicts of guilty of murder, conspiracy and solicitation. The trial court entered convictions on all three offenses, then sentenced defendant to 30 years' imprisonment for murder and a concurrent term of 20 years for solicitation, but did not impose a sentence for conspiracy.

■ Defendant first contends the court erred when it failed to instruct the jury regarding self-defense and voluntary manslaughter. Because defendant was accused of murder by accountability, we must look to the evidence regarding the actions of William Gill to determine whether such instructions were required.

We find the facts here very similar to those addressed by the supreme court in *People v. Sloan* (1986), 111 Ill. 2d 517, 490 N.E.2d 1260. In *Sloan*, the evidence showed the defendant had broken down a door to enter a home and killed the boyfriend of his former girlfriend. The defendant testified that he took a gun with him for protection when he went to the home in the early morning hours, but that the sole purpose of his visit was to see his child. The defendant testified that the victim started charging him, the defendant brought the gun out, the defendant then stumbled, and the gun went off accidentally. The supreme court found that the defendant's use of force was precluded by section 7—4(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 7—4(c)). (*People v. Sloan* (1986), 111 Ill. 2d 517, 521, 490 N.E.2d 1260, 1262.) Section 7—4, concerning the use of force by an aggressor, provides:

> "The justification described in the preceding Sections of this Article is not available to a person who:

(a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony; or

(b) Initially provokes the use of force against himself, with the intent to use such force as an excuse to inflict bodily harm upon the assailant; or

(c) Otherwise initially provokes the use of force against himself, unless:

(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." (Ill. Rev. Stat. 1979, ch. 38, par. 7—4.)

The supreme court in *Sloan* found that the defendant was clearly the aggressor and that the slight display of force by the victim was provoked by the defendant's own conduct. The court, in holding that instructions on self-defense and voluntary manslaughter were not required, concluded: "The defendant's armed and unauthorized entry of the residence at that hour [2 a.m.] in the morning belies his ostensibly peaceful purpose in making the visit." *People v. Sloan* (1986), 111 Ill. 2d 517, 522, 490 N.E.2d 1260, 1262.

In the case *sub judice*, defendant argues that self-defense and voluntary manslaughter instructions should have been given because Gill testified that once he entered the Davidson home, Stephen Davidson approached him, punched him in the face, then began fighting with him. Even if we accept this evidence as true, Gill's own testimony shows that Stephen Davidson's reaction was provoked by defendant's own conduct. Gill's own testimony indicated that he, Gill, was the aggressor. He came to the home armed with a gun. He admitted picking up the piece of wood from a woodpile before entering the home, but then decided to discard it. He parked his car a mile from the home, then jogged the remainder of the distance so no one would know he was at the home. He testified he knew Stephen Davidson would be upset when confronted about divorcing his wife. Gill admitted he did not have permission to enter the home that night. He did not go to the front door because he knew if Stephen Davidson saw him coming, he would "slam the door in my face," so he entered through the garage door and the basement. Applying the decision in *Sloan*, we do

not believe that under these circumstances defendant was entitled to instructions regarding self-defense or voluntary manslaughter due to section 7—4(c) of the Criminal Code. We have also examined defendant's other arguments regarding the instructions and likewise found them to be without merit.

■ Defendant next contends she was twice placed in jeopardy for the same offense. Defendant was tried for the first time in this case in 1982. In the middle of that first trial, defendant moved to exclude handwriting exemplars which she executed as well as testimony of a prosecution witness. The trial court granted these motions. The State then moved for a mistrial so that it could take an interlocutory appeal to this court. The trial court granted the mistrial, and the State appealed pursuant to Supreme Court Rule 604(a)(1) (87 Ill. 2d R. 604(a)(1)). On appeal, this court held that defendant's motion to exclude was untimely and we vacated the orders excluding the evidence and remanded the cause for a continuation of the trial. (*People v. Davidson* (1983), 116 Ill. App. 3d 164, 451 N.E.2d 978 (hereinafter *Davidson I*).) In that opinion, we addressed the double jeopardy issue which was raised by defendant at that time and concluded that "[b]ecause the mistrial was triggered by the defendant's untimely motions to suppress, she may be tried without violating the proscription against double jeopardy." (116 Ill. App. 3d 164, 172, 451 N.E.2d 978, 984.) Therefore, the double jeopardy issue has been addressed by this court and decided against defendant. In addition, defendant unsuccessfully sought review of *Davidson I* in the Illinois Supreme Court. Upon remand after *Davidson I*, defendant filed a motion to dismiss on double jeopardy grounds. After the trial court's denial of the motion, defendant's appeal to this court of that denial was dismissed, and her efforts to obtain review by the supreme courts of both Illinois and the United States were unsuccessful. Defendant still contends, however, that because our opinion in *Davidson I* did not address the constitutionality of Rule 604(a)(1), and because she raised the constitutional issue at her second trial, we should now address it. In deciding the double jeopardy question in *Davidson I*, we cited the supreme court opinion in *People v. Flatt* (1980), 82 Ill. 2d 250, 265, 412 N.E.2d 509, 517, which found that allowing retrial after an interlocutory appeal by the State pursuant to Rule 604(a)(1) did not violate the constitutional proscription against double jeopardy when it was defendant's conduct which necessitated the mistrial. Therefore, we reject defendant's argument that Rule 604(a)(1) is unconstitutional and find the proscription against double jeopardy was not violated here.

■ Defendant further argues that her rights to equal protection

and due process under the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) have been violated by the failure of Illinois courts to uniformly interpret and apply Rule 604(a)(1) as that rule relates to the law of double jeopardy. Defendant argues that in *Davidson I* we failed to follow the decision in *People v. Johnson* (1983), 113 Ill. App. 3d 367, 447 N.E.2d 502, and that under *Johnson* she could not be retried. Thus she contends that her rights to equal protection and due process have been violated because of the lack of uniform application of the rule. Assuming without deciding that *Davidson I* and *Johnson* are inconsistent, the fourteenth amendment does not assure uniformity of judicial decisions or immunity from judicial error. (*Beck v. Washington* (1962), 369 U.S. 541, 554-55, 8 L. Ed. 2d 98, 110, 82 S. Ct. 955, 962-63.) Therefore, defendant's argument is without merit.

■■ ■ The next issue raised by defendant is whether the trial court erred when it failed to remove the prosecutor from defendant's case. Mark Rotert, an assistant Attorney General, prosecuted defendant at both her first and second trials because the Madison County State's Attorney withdrew from the case. Prior to her second trial, defendant moved to remove the Attorney General's office from the case on the grounds that Rotert had contributed to an antiretention campaign aimed at Judge William Johnson, who had presided over defendant's first trial. Advertisements placed in newspapers during this campaign criticized Judge Johnson's rulings in defendant's first trial. Rotert conceded that he had made a contribution to the campaign but stated that he was not personally involved in generating adverse publicity about Judge Johnson's rulings in defendant's case. Judge Charles Romani, who presided over defendant's second trial, found that whether the prosecutor had contributed to an antiretention campaign against Judge Johnson was no longer relevant. We agree.

Section 6 of "AN ACT in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1983, ch. 14, par. 6) provides in part: "Whenever the attorney general or state's attorney is sick or absent, or unable to attend, or is interested in any cause or proceeding, civil or criminal, which it is or may be his duty to prosecute or defend, the court in which said cause or proceeding is pending may appoint some competent attorney to prosecute or defend such cause or proceeding ***." The appointment of a special prosecutor involves the exercise of judicial discretion in the determination of whether a contingency authorizing the exercise of such power has arisen. (*People v. Trolia* (1982), 107 Ill. App. 3d 487, 496, 437 N.E.2d 804, 811, *cert. denied* (1983), 460 U.S. 1044, 75 L. Ed. 2d 798, 103 S. Ct. 1442.) The term

"interested" as used in this statute has been interpreted to mean that the prosecutor must be interested as (1) a private individual, or (2) a party to the action. (107 Ill. App. 3d 487, 496, 437 N.E.2d 804, 811.) Defendant cites to *People v. Barton* (1984), 122 Ill. App. 3d 1079, 1084, 462 N.E.2d 538, 542, *cert. denied* (1985), 469 U.S. 1213, 84 L. Ed. 2d 332, 105 S. Ct. 1185, to argue that adverse publicity generated by a prosecutor about a criminal case can mean the prosecutor is interested in the case. The State argues, citing *People v. Trolia*, that not every act of prosecutorial misconduct must result in removal.

■ We find no abuse of discretion in Judge Romani's decision not to remove the Attorney General's office from the case. Judge Johnson was no longer presiding over defendant's case, and as of the time of the retention election had not presided over the case for over 2½ years. Rotert stated he was not directly involved in producing the advertisements. Furthermore, we agree with the State that if defendant believed the advertisements regarding Judge Johnson were a cause of potential prejudice to her second trial, the *voir dire* process would serve as a safeguard. Defendant has not raised the issue of whether the jury was affected by the pretrial publicity. We have reviewed the record and fail to see how defendant was prejudiced by the court's decision not to remove the Attorney General's office from the case.

■ Defendant next raises multiple arguments to support her contention that the cards and letters authored by her and Gill should have been suppressed. The trial court held a lengthy hearing on defendant's suppression motion, then ruled the correspondence was admissible. The evidence at the suppression hearing showed that the McGarveys gave attorney Russell Meyer the cards and letters which they had found in Gill's apartment. Meyer at this time was Gill's attorney, but was not yet representing defendant. Meyer began serving as defendant's counsel a short time later when he entered an appearance on her behalf in the trial court.

After receiving the cards and letters from the McGarveys, Meyer gave the documents to Edward Unsell, a lawyer working for Meyer's firm, and told Unsell to place them in a safe-deposit box. Meyer testified that he feared possible criminal liability arising from his possession of the correspondence. Attorneys from the Madison County State's Attorney's office had discussed with him their belief he could be charged with obstructing justice if he failed to give the letters to authorities. On March 28, 1980, Meyer, Unsell, and attorneys from the State's Attorney's office gathered at a tavern in Edwardsville. While this was primarily a social gathering, the topic of the cards and letters was raised. Attorney Unsell made comments about transfer-

ring the documents to the attorney who was then serving as defendant's primary counsel, Donald Groshong, and made a reference to having the "keys." An assistant State's Attorney asked Unsell in which bank the letters were located, but Unsell did not respond. Unsell testified that he was under the impression everyone knew the correspondence was being kept at a bank. Meyer testified that it was common knowledge that he had possession of the letters. An assistant State's Attorney testified he believed Unsell made some comments about the correspondence being in a bank, but testified he was making some assumptions from Unsell's comments. Another assistant State's Attorney testified that the State was aware that Karen McGarvey had testified before the grand jury that when she took the cards and letters to Meyer's office, Meyer told her that he would probably place the correspondence in a safe-deposit box.

A few days after the conversation at the Edwardsville tavern, the State's Attorney's office attempted to determine the precise location of the cards and letters. A police officer called a bank in Bethalto and was able to obtain information that Meyer had opened a safe-deposit box at the bank in November of 1979, and that there had been no activity regarding the box since it had been opened. The State then obtained a search warrant, and eventually seized the cards and letters from the safe-deposit box.

Defendant first contends that the seizure of the cards and letters from the safe-deposit box violated her right against self-incrimination under the fifth amendment to the United States Constitution (U.S. Const., amend. V). Defendant's argument is without merit. She was not compelled to write these cards and letters. The United States Supreme Court in *Andresen v. Maryland* (1976), 427 U.S. 463, 49 L. Ed. 2d 627, 96 S. Ct. 2737, addressed a similar argument and concluded there was no fifth amendment violation. The court stated:

> "[I]n this case, petitioner was not asked to say or to do anything. The records seized contained statements that petitioner had voluntarily committed to writing. The search for and seizure of these records were conducted by law enforcement personnel. *** Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present." (427 U.S. 463, 473, 49 L. Ed. 2d 627, 638, 96 S. Ct. 2737, 2745.)

The court further stated:

> "Thus, although the Fifth Amendment may protect an individual from complying with a subpoena for the production of his personal records in his possession because the very act of pro-

duction may constitute a compulsory authentication of incriminating information, [citation], a seizure of the same materials by law enforcement officers differs in a crucial respect—the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence." (427 U.S. 463, 473-74, 49 L. Ed. 2d 627, 638, 96 S. Ct. 2737, 2745.)

We conclude defendant's fifth amendment rights were not violated.

■■ ■ Defendant also argues that her rights under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) were violated by the search of the safe-deposit box. Defendant cites cases from other jurisdictions for the proposition that searches of an attorney's office for a client's documents are unreasonable. We acknowledge the inherent dangers involved when police seek to search an attorney's office. There is a great likelihood in such circumstances that police will discover confidential information that is immune from seizure. (See 2 LaFave, Search & Seizure sec. 4.1(g) (2d ed. 1987).) In the present case, however, we are not faced with a search of an attorney's office. The search here was of a lawyer's safe-deposit box. Police had information that this box had been opened by attorney Meyer shortly after the McGarveys brought him the cards and letters. The State also had information that attorney Meyer had stated he would probably place these documents in a safe-deposit box. The State also had learned from the bank that there had been no activity with regard to this box since it had been opened. Therefore, it was reasonable to believe that there would be little chance that police would discover matters in the box other than the cards and letters. We believe the narrow scope of this search renders it reasonable.

■■ Defendant also argues that her attorneys were coerced into disclosing the location of the cards and letters by threats from lawyers from the State's Attorney's office that the defense lawyers could be faced with criminal prosecution if they concealed these documents. The evidence, however, shows that the State seized the letters by way of a search warrant after calling a bank to determine if attorney Meyer had opened a safe-deposit box there. While there was some testimony that attorney Unsell may have made some reference to a bank during the conversation at the tavern in Edwardsville, he did not disclose to the State in which bank the documents were located. Moreover, the uncontradicted evidence at the suppression hearing demonstrated that it was common knowledge that attorney Meyer had possession of the cards and letters and that the State knew he would likely place them in a safe-deposit box. The evidence supports a

conclusion that defendant's attorneys did not reveal the location of the documents and the evidence thus supports the trial court's denial of defendant's motion to suppress.

Defendant also argues that the issuance of the search warrant was contrary to the law of the case as established by an earlier order of the trial court. The court had ruled against the State's motion for production of the cards and letters. Defendant argues this was in effect a suppression order, and that the State should have appealed the order pursuant to Supreme Court Rule 604(a)(1) (87 Ill. 2d R. 604(a)(1)), and because the State did not, the ruling became the law of the case. We do not agree that the court's ruling was a suppression order. The court did not prohibit the State from seizing the documents by means of a search warrant, but merely refused to order the defense to turn them over to the State.

In summary, we have found no reason to disturb the trial court's denial of defendant's motion to suppress the cards and letters seized pursuant to the search warrant from the safe-deposit box.

Defendant next contends the court erroneously denied her the opportunity to cross-examine defense witness William Gill. Prior to Gill's testimony, the court ruled that defendant would not be able to impeach Gill about the fact he had been convicted of voluntary manslaughter in the death of Stephen Davidson. The State offered to allow defendant to impeach Gill by telling the jury he had been convicted in connection with the death of Stephen Davidson without informing the jury of the specific crime for which he was convicted, but defendant refused this offer.

Defendant contends that under Supreme Court Rule 238(a) (87 Ill. 2d R. 238(a)), she was entitled to impeach Gill with his prior conviction even though he was her primary defense witness. Rule 238(a) provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." Defendant argues this rule gave her an absolute right to impeach Gill. The State argues that defendant had no reason to impeach Gill because she wanted the jury to believe all of Gill's testimony, and that the reason defendant wanted to introduce evidence of Gill's conviction for voluntary manslaughter was to persuade the jury that defendant should not be convicted of murder because Gill was convicted of a lesser charge.

It is clear that the fact Gill was convicted of voluntary manslaughter and not murder is not relevant to the issue of defendant's guilt for murder. Section 5—3 of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 5—3) states: "A person who is legally accountable for the conduct of another which is an element of an offense may be con-

victed upon proof that the offense was committed and that he was so accountable, although the other person claimed to have committed the offense has not been prosecuted or convicted, or has been convicted of a different offense or degree of offense, or is not amenable to justice, or has been acquitted." Therefore, Gill's conviction for voluntary manslaughter cannot be used as substantive evidence to exonerate defendant. There is no question, however, that defendant should be able to impeach her own witnesses. We also do not doubt her right to impeach her witnesses by informing the jury of the prior conviction of a witness. We find any error here, however, not to require reversal. Defendant has failed to explain why she would want to impeach Gill's testimony. It appears clear her reason for desiring to place Gill's conviction for voluntary manslaughter before the jury was to persuade the jurors that she should not be convicted of murder. Had she desired to impeach Gill, or to make an anticipatory disclosure of the conviction, she should have accepted the State's offer to allow her to tell the jury he had been convicted in the case without naming the specific offense.

▄▄ Defendant next argues the conspiracy and solicitation counts of the information were defective and that the State failed to prove these two offenses. We need not address these arguments because, for the reasons which follow, defendant's convictions for conspiracy and solicitation must be vacated.

Section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 8—5) provides: "No person shall be convicted of both the inchoate and the principal offense." The committee comments to section 8—5 clearly state that this provision applies to conspiracy and solicitation. (Ill. Ann. Stat., ch. 38, par. 8—5, Committee Comments, at 579 (Smith-Hurd 1972).) Our supreme court, in *People v. Hill* (1980), 78 Ill. 2d 465, 476, 401 N.E.2d 517, 522, held that this statute requires that a conviction for conspiracy to commit murder must be vacated where the defendant has also been convicted of murder. Under *Hill*, defendant's conspiracy conviction in the present case must be vacated.

We also believe the plain language of section 8—5 mandates that we vacate defendant's conviction and sentence for solicitation. We acknowledge that in *People v. Columbo* (1983), 118 Ill. App. 3d 882, 984-85, 455 N.E.2d 733, 806-07, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394, the court held that section 8—5 does not prohibit convictions for both solicitation and murder. That decision relied upon the supreme court's decision in *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29

L. Ed. 2d 136, 91 S. Ct. 1658. In *Hairston*, the defendant was charged under the theory of accountability with murder and attempted murder, and was also charged with soliciting another person to commit the principal crimes. A jury found defendant not guilty of murder and attempted murder, but guilty of solicitation. Defendant claimed on appeal that the crime of solicitation merges with the principal offense if the latter offense is in fact committed, and that therefore his acquittal on the murder and attempted murder charges operated as a bar to his conviction of solicitation. The supreme court stated: "Having specifically spelled out that solicitation is a separate and distinct crime, punishable and triable as such, the legislature could not have intended that a merger with the principal crimes would be effected as defendant contends." 46 Ill. 2d 348, 357, 263 N.E.2d 840, 846-47.

We cannot agree with *Columbo* that *Hairston* allows for convictions of both murder and solicitation to commit murder. The supreme court was simply rejecting the defendant's argument that an acquittal on a murder charge precluded a conviction for solicitation. The court did not hold that a person can be convicted of both murder and solicitation, but in fact cited the language of the committee comments that convictions for both violate the statute. The *Columbo* court's reliance on *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, is also misplaced. *King* did not address the clear language of section 8—5 regarding inchoate offenses. Therefore, we conclude defendant's conviction and sentence for solicitation must also be vacated.

■■ ■ Next defendant argues the court erred in admitting into evidence handwriting exemplars executed by defendant. These exemplars were relied upon by the State's handwriting expert, Arthur Anthony, who testified that the handwriting on some of the letters was that of defendant, and that the handwriting on others was "probably prepared" by defendant. On cross-examination regarding the exemplars written by defendant, Anthony conceded that it was not good practice to instruct an individual on how to space the words in an exemplar. The evidence showed defendant had been instructed on which words from the questioned letters to write on the exemplars and how to space the words. Defendant contends for this reason the exemplars should not have been admitted or relied upon by Anthony.

The method in which the exemplars were prepared goes to the weight to be given this evidence, not its admissibility. We note that Anthony testified that while it was not good practice to instruct an individual on how to space the words on an exemplar, he also testified

that the fact this was done here would not affect his opinion. Moreover, any error here would have to be deemed harmless because there was other competent evidence that defendant authored the questioned cards and letters. (See *People v. McNichols* (1986), 139 Ill. App. 3d 947, 956, 487 N.E.2d 1252, 1259.) In addition to circumstantial evidence presented by the State showing defendant had written this correspondence, the McGarveys testified that defendant acknowledged the existence of the correspondence. Furthermore, Gill himself testified that the letters found in his apartment were written to him by defendant. In addition, some of the most incriminating statements made in the correspondence were within letters typewritten by defendant, thus requiring no handwriting identification. Gill testified the defendant had sent him these typewritten letters. For these reasons, we find no reversible error in the admission of the exemplars.

■■ Defendant's final argument is that the court erred in admitting evidence that Gill showed police the location of the alleged murder weapon. Madison County sheriff's deputy Jerry Knight testified that Gill was present on November 1, 1979, with Knight and other police officers on the banks of the Mississippi River. Knight testified that Gill picked up a rock and threw it into the river and that a gun was found in the river at the location where the rock went into the water. Defendant argues this evidence constituted inadmissible hearsay and should have been excluded.

Defendant has waived this issue on appeal because she failed to object at trial when Knight testified (see *People v. Stewart* (1984), 105 Ill. 2d 22, 56, 473 N.E.2d 840, 857, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666), and failed to include this issue in her post-trial motion. (See *People v. Wright* (1985), 111 Ill. 2d 128, 148, 490 N.E.2d 640, 647, *cert. denied* (1987), ___ U.S. ___, 94 L. Ed. 2d 179, 107 S. Ct. 1327.) Furthermore, we cannot conclude any error here rises to the level of plain error because this evidence was cumulative of other evidence properly admitted. (See *People v. McNichols*, 139 Ill. App. 3d 947, 956, 487 N.E.2d 1252, 1259.) The State's evidence established the gun found in the river as being the murder weapon. Robert McGarvey testified for the State that this gun appeared to be the one owned by William Gill. Moreover, Gill himself testified in direct testimony for the defense that he had this gun at the Davidson residence, that shots were fired from this gun, and that after the incident at the Davidson home he threw the gun into the river. Thus, we find no reversible error in the admission of Knight's testimony that Gill threw a rock into the river at the location of the gun.

120

For the foregoing reasons, defendant's conviction for conspiracy is vacated; defendant's conviction and sentence for solicitation are vacated; and defendant's conviction and sentence for murder are affirmed.

Vacated in part; affirmed in part.

KARNS, P.J., and KASSERMAN, J., concur.