# Illinois Official Reports

## Appellate Court

---

### *In re M.S.*, 2018 IL App (1st) 172659

---

| | |
|---|---|
| Appellate Court Caption | *In re* M.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Marie H., Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-17-2659 |
| Filed | May 1, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-JA-344; the Hon. Kimberly D. Lewis, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Jean M. Agathen, of counsel), guardian *ad litem*. |

Panel JUSTICE HYMAN delivered the judgment of the court, with opinion Presiding Justice Neville and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1 M.S. and his older brother, J.S., were made wards of the court and have lived with foster parent Crystal B. since 2013. Caseworkers found that both boys were thriving, that Crystal's home was a safe and appropriate placement for them, and that it would be in the children's best interests to appoint Crystal as their guardian. The boys wanted to continue living with Crystal and did not want to return to their mother's home. After the trial court appointed Crystal as J.S.'s guardian (*In re J.S.*, 2017 IL App (1st) 170506-U), the court granted the State's petition for the appointment of Crystal as M.S.'s guardian. M.S.'s mother, Marie H., argues the trial court violated the Juvenile Court Act of 1987 and her due process rights by having an off-the-record, *ex parte* conversation with M.S. before the guardianship hearing and relying on that conversation, in part, in deciding to appoint Crystal as guardian. Marie asks that we remand for a new guardianship hearing before a different judge.

¶ 2 The facts and law before us justify the trial court's order appointing Crystal the guardian of M.S. so we affirm. Marie's attorney did not object during the hearing when the trial judge said she had a conversation with M.S. If Marie had raised an issue about the conversation, the trial court could have addressed it. Thus, Marie forfeited the issue. And Marie has not shown she was prejudiced by the conversation as multiple witnesses testified that M.S. said he wanted to continue living with Crystal.

¶ 3 Background

¶ 4 M.S., now age 13, is the son of Marie H. and A.S. (A.S. is not party to this appeal). In July 2012, the State filed a petition in Kane County for adjudication of wardship for M.S., as well as his older brother, J.S., and his seven other siblings. The petition alleged neglect of M.S. due to an environment injurious to his welfare and that he was without care necessary for his well-being, including adequate food, clothing, and shelter. Specifically, the petition stated that M.S. resided in a home without electricity or sufficient food and that his mother's substance abuse issues and domestic violence in the home placed him at risk of harm.

¶ 5 In December 2012, the Kane County circuit court entered a dispositional order adjudicating M.S. neglected. He was made a ward of the court and placed in the guardianship of the Department of Children and Family Services (DCFS). The court found both parents unfit and unable to care for, protect, train, educate, or discipline M.S. for reasons other than financial circumstances alone. The court cited a history of domestic violence in the home and noted that services had begun but the parents needed to make more progress and establish an adequate care plan. The order stated that while reasonable efforts and appropriate services aimed at family reunification had been made to keep M.S. in the home, these actions have not eliminated the necessity for his removal, as the parents failed to cooperate with services in two previous intact cases. The permanency goal was set as return home in 12 months and supervised visitation was ordered.

¶ 6        When M.S.'s parents moved, the case was transferred to Cook County. In 2013, M.S. and his brother, J.S., were placed in the home of foster parent, Crystal B. In December 2013, after a permanency hearing, the trial court determined that M.S. was doing well in his foster home. M.S.'s parents were compliant with services but needed to make more progress. M.S.'s permanency goal was to return home within 12 months.

¶ 7        Ten months later, after a permanency hearing at which both parents were present, the permanency goal was changed to private guardianship, which remained the goal for the remainder of the case.

¶ 8        In 2016, a new trial judge held a permanency hearing for M.S. and J.S. By that time, Marie's other children had been successfully returned home, and M.S. and J.S. continued to live with Crystal. The caseworker testified that the boys had a planned visit home on Thanksgiving 2015. Before the visit, Marie called Crystal and told her M.S. and J.S. would be returning home and that she intended to sue DCFS. Then, J.S. received a text from his sister saying he was "breaking his mom's heart for not wanting to come home." J.S. responded by text that he and his brother were not supposed to discuss the case. Crystal brought the boys to Marie's home, but shortly after their arrival, J.S. and his sister got into an argument, and J.S. called Crystal and asked her to pick them up.

¶ 9        The caseworker testified that after Thanksgiving the brothers did not want further visitations. A visit was scheduled for February 2016, but Marie texted J.S., and the boys changed their minds. They told the caseworker that Marie always wants to "discuss the case and ask them why they are not returning home." Although they desired to see their siblings, the brothers considered the visits to their mother's home to be uncomfortable because of the conversations about the case.

¶ 10       According to the caseworker, M.S. did well in school and had an individualized education program (IEP), with Crystal monitoring his homework and M.S. receiving tutoring services. He participated in extracurricular activities and played on two basketball teams. M.S. told the caseworker he wanted to remain with his brother with guardianship as the goal; he does not wish to return to his parents due to the history in the home.

¶ 11       M.S.'s mother, Marie, told the trial court that she has nine children and she does not "think that it's right to separate the two, because it's hurting the whole home. My kids want their brothers home. We want our kids home." The trial judge told Marie, "it's evident you love your children," and praised Marie for completing services so that her other children could return home. But, the judge stated,

> "The hard part of the conversation is that your other two children are getting to the age where they get to voice their opinions. And what I have to do is not only consider what you want, but I also have to consider what they want, and also what's in their best interests. The testimony I got was your two kids love you. They don't want their rights terminated; they want you to be their parents. *** And, you know, there is one side of the coin where I can say they are kids, they don't know what they want. On the flip side of that same coin, however, they have gone through quite a bit of experience for their young ages. And they've made a determination that they are settled, they are doing well, and they want to stay settled where they are. But that doesn't mean they don't want to visit. They want to have connections; they want to be a family but they don't want to live at home."

¶ 12     The trial judge advised the parents that they were not to discuss the case with M.S. and J.S. While the boys wanted to visit, the trial court said it would not force a visit as long as the parents continued to discuss the case with them. The court explained to the parents that should guardianship be granted, the boys continue to be their children and their parental rights would not be terminated. The court ordered supervised visitation and entered an order with the goal of guardianship.

¶ 13     In January 2017, the trial court held a combined permanency hearing for M.S. and J.S. Both boys were in court. Marie was not present. Addressing the judge in open court, J.S. said he did not want to return to Marie's home because he did not trust his mother. He said he had been living in Crystal's home for nearly four years and was "very, very comfortable" there. He did not feel obligated to return to his mother's home because she tells him things that are not true, and he's worried he "might just walk into a trap."

¶ 14     The caseworker testified she had no concerns about M.S.'s health or safety and no reported complaints or unusual incidents. Crystal involved herself in his schooling, and the agency worked with Crystal and M.S.'s school to make sure M.S. adhered to his IEP and received an appropriate education. M.S. wanted Crystal to be appointed his guardian, and it was still in his best interest.

¶ 15     Crystal testified that M.S. and J.S. live with her and that no one else lives in the home. She said she is supportive of a relationship between the boys and their parents.

¶ 16     At the end of the hearing, the trial court granted DCFS's motion to place J.S. in private guardianship with Crystal and closed his case. The court also set private guardianship as M.S.'s permanency goal. At a status hearing, the caseworker testified that the subsidy for M.S. had been approved by DCFS and that the case would go to legal screening that day to complete the guardianship goal.

¶ 17     In September 2017, DCFS filed a motion to vacate its guardianship of M.S., terminate wardship, and close the case. DCFS also filed a petition to appoint Crystal as M.S.'s guardian. At the hearing on DCFS's motions, Marie's attorney was present, but not Marie. At the start of the hearing, the trial judge said, "I can just briefly indicate that [M.S.] has indicated, just as a synopsis, that he really likes staying with [Crystal] and he wants to stay there and he feels that he has enriching activities and that she's supportive of his education, tutoring. And he enjoys basketball, *et cetera*."

¶ 18     At the hearing, the caseworker testified that M.S. and J.S. had been living with Crystal for about 4½ years. M.S. and Crystal had a great bond and an emotional attachment, as it appeared that they loved each other. M.S. told the caseworker he wanted to stay in Crystal's home. Adoption was ruled out as Marie had successfully completed services. Returning to Marie's home also was ruled out as M.S. said he did not want to return to his mother's care. The agency recommended that Crystal be appointed M.S.'s guardian.

¶ 19     On cross-examination, the caseworker stated that Crystal, who is a teacher, has been a strong educational advocate for M.S. She was influential in getting his IEP modified to meet his needs and helped him transfer schools when he was being bullied. She supported his playing basketball, attended his games, and paid for him to play extra basketball on weekends. M.S.'s brother was thriving in Crystal's home as well. She would facilitate visits with M.S., J.S., and their siblings if the boys wanted to visit them.

¶ 20    Crystal testified she wants to be appointed M.S.'s guardian and is aware of all of the conditions of guardianship. She has been committed to M.S.'s education and his extracurricular activities. During the summers, she took the boys to Cincinnati, and they participate on travel basketball teams. M.S. is involved with her extended family. Indeed, her brother and father, who live nearby, consider M.S. and J.S. to be part of the family. She understood that M.S.'s parents would be entitled to reasonable visitation of at least one visit a month. And, she is willing to facilitate M.S.'s visits with them and to foster his relationships with his siblings.

¶ 21    After the parties rested, the DCFS attorney argued for Crystal as an appropriate caregiver for M.S. given that he was thriving in her home, and it was in his best interest that she be appointed his guardian. The assistant public guardian agreed, stating it is "a great home," and "he's always seemed happy and comfortable there and has a lot of enrichment activities." The State supported the guardianship motion too. Marie's attorney stated, "Natural mother opposes it. No other argument."

¶ 22    In issuing her ruling, the trial judge said she "had the lovely opportunity to speak to [M.S.] and I enjoyed our conversation. Everyone is really proud of [M.S.]" She noted that M.S. was thriving in Crystal's home and "has all of the support he needs." Also, Crystal agreed to facilitate visits between M.S. and his parents, if that is what M.S. wants. She then concluded that it was "definitely in [M.S.]'s best interest for [Crystal] to become his legal guardian." The trial court vacated DCFS's guardianship, terminated the court's wardship, appointed Crystal as M.S.'s guardian, and closed the case.

¶ 23                                                Analysis

¶ 24    Marie argues the trial court committed plain error and denied her due process rights by relying on an off-the-record, *ex parte* conversation with M.S. when deciding to appoint Crystal as M.S.'s guardian. Specifically, she points to the judge's comments before the hearing that "[M.S.] has indicated *** that he really likes staying with Crystal and he wants to stay there ***" and the judge's comment at the end of the hearing that "I had the lovely opportunity to speak to M.S.] and I enjoyed our conversation."

¶ 25    While the record does not indicate that M.S. testified or who was present for this conversation, arguably, at least, it appears the trial judge and M.S. had a substantive conversation outside the presence of her attorney. Marie acknowledges that in some circumstances, a trial judge can speak with a minor in chambers but asserts that the Juvenile Court Act of 1987 and the due process clause of the Constitution require that those conversations take place in the presence of counsel or a court reporter, unless otherwise agreed. She argues that this conversation constitutes reversible error and asks us to remand for a hearing before a different judge.

¶ 26    Assuming a conversation outside the presence of the parties and their attorneys occurred, Marie failed to preserve the alleged error for appellate review by objecting at trial and filing a written posttrial motion addressing it. *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) ("Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived."). Marie did not object or seek clarification when, before hearing testimony at the guardianship hearing, the trial judge stated that M.S. indicated he wants to continue living with Crystal. The judge's comment at the end of the hearing that she "had the lovely opportunity to speak to [M.S.]" suggests she spoke to

M.S. but not where or when. Although Marie was not in court that day, the record shows her attorney was there and her attorney had an opportunity to object. So she has forfeited the issue and cannot raise it for the first time on appeal. *In re William H.*, 407 Ill. App. 3d 858, 869-70 (2011) (application to child custody cases).

¶ 27 Marie argues that forfeiture limits the parties and not the court, and we may relax the rules of forfeiture where an issue impacts the fundamental fairness of a proceeding and address it under the plain error rubric. See *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30. Even if the trial court erred and held an improper *ex parte* conversation with M.S., for plain error to apply, the error must be prejudicial; that is, the case must be a close one. *People v. Sebby*, 2017 IL 119445, ¶ 68 (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). In civil cases, the plain error rule usually applies "only where an act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." (Internal quotation marks omitted.) *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007).

¶ 28 We cannot say that the trial judge's conversation, if it did occur outside the presence of the attorneys, was critical to the decision or potentially dispositive, as it was merely cumulative of the evidence presented by multiple witnesses. See *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 303-04 (2002) (finding no prejudice where allegedly inadmissible testimony elicited during adverse examination of defendant doctor was cumulative of previously introduced testimony); *People v. Davidson*, 160 Ill. App. 3d 99, 119 (1987) (no plain error where evidence "cumulative of other evidence properly admitted").

¶ 29 In deciding that guardianship was in M.S.'s best interest, caseworkers relied on their determination that Crystal provided a stable home for M.S. and J.S. and that M.S. and Crystal bonded over more than four years and appeared to love each other. Also, M.S.'s educational needs were being met, and he engaged in extracurricular activities. Significantly, Crystal supported M.S.'s continued relationship with his parents.

¶ 30 Caseworkers testified on multiple occasions that M.S. consistently told them he felt happy in his current living situation, wanted to continue living with Crystal, and did not want to return to his mother's home. And, he wanted Crystal to be appointed as his guardian. As the trial judge advised Marie, she had to consider not only what the parents wanted but also what M.S. wanted, and multiple witnesses testified that M.S. wanted Crystal to be appointed his guardian.

¶ 31 To the extent that a purported off-the-record conversation factored into the trial court's decision to appoint Crystal as M.S.'s guardian, the conversation was merely cumulative.

¶ 32 Affirmed.