2023 IL App (1st) 220816
No. 1-22-0816
Opinion filed: January 23, 2023

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.F. and A.F. | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 21 JA 1009-20 |
| Aylissa F. and John W., | ) | |
| | ) | |
| Respondents | ) | |
| | ) | |
| (Aylissa F., Respondent-Appellant)). | ) | The Honorable |
| | ) | Levander Smith, Jr., |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Lavin and Hyman concurred in the judgment and opinion.

## OPINION

¶ 1        Aylissa F. (Aylissa) appeals from the adjudication orders finding her two minor children

neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of

1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)), as well as from the subsequent dispositional

orders making the minors wards of the court. For the following reasons, we affirm the trial court's

orders.

¶ 2                                    I. BACKGROUND

¶ 3          Aylissa is the mother of K.F., a boy born in January 2016, and A.F., a daughter born in August 2019. On October 28, 2021, the State filed petitions for adjudication of wardship for both minors, alleging they were neglected under the Act due to an injurious environment and because they were at a substantial risk of physical injury. The State alleged the following supporting facts:

> "On or about October 7, 2020, mother's paramour displayed violent behavior in the home. Natural mother has continued to allow this paramour to have contact with the minors and on 10/5/21, admitted to using illegal drugs with him. On or about 10/15/21, mother's other paramour drove his car with mother in it into a tree immediately after expressing suicidal ideations. Natural mother continues to have contact with this paramour as well. Natural mother and putative father have a history of domestic violence. Natural mother has a history of illegal drug use and has tested positive for cocaine, heroin and hydromorphone multiple times in September and October 2021. The identity and whereabouts of putative father are unknown."[1]

¶ 4          The State simultaneously filed motions for temporary custody of both minors. Following a temporary custody hearing on November 10, 2021, the trial court entered orders placing the minors in temporary custody of the DCFS Guardianship Administrator.

---

[1]In March 2022, there was a paternity finding that John W. was K.F.'s father. Jonathan T. was later identified as the putative father of A.F. Neither father is a party to this appeal.

¶ 5                          A. Documentary Evidence Admitted at the Adjudicatory Hearing

¶ 6           On May 10, 2022, the court conducted an adjudicatory hearing. Without any objection from Aylissa's counsel, the court admitted two sets of documentary evidence: records from Treatment Alternatives for Safe Communities (TASC) (exhibit 1) and records from the Gateway Foundation drug treatment facility (Gateway) (exhibit 2).

¶ 7           TASC records reflected that a saliva specimen collected from Aylissa on September 24, 2021, tested positive for opiates, cannabinoids, cocaine, and heroin. A sample collected on October 6, 2021, tested positive for alcohol, opiates, cocaine, and morphine. A sample collected on October 21, 2021, tested positive for opiates and cannabinoids.

¶ 8           Gateway's records indicated that Aylissa was assessed on October 11, 2021, admitted to a treatment program the next day, and that she was discharged on November 4, 2021. At her assessment, Aylissa reported that she had "more than a decade of heroin use," having first used it when she was 18.[2] She reported that she abstained from heroin between 2009 and 2021, before relapsing.

¶ 9           As of October 11, 2021, Aylissa reported that for the last three months she was using "one bag a day" of heroin via "inhalation" and that her last use was on October 8, 2021. The reported "Method of Acquiring Substance" was a "Friend." Under "Associated Relapse Factors," Gateway reported that Aylissa's "Partner is currently usings drug/alcohol" but the same record stated that "[h]e's now her ex."

¶ 10          Gateway records also reflect that Aylissa reported: "The landlord saw me getting high and called DCFS, we have a case plan in place and my children stay with a family friend, I get to see

_____

[2]The record reflects that Aylissa was born in 1986 and was 35 years old as of October 2021.

them everyday." She expressed a desire for treatment in order to be a better parent and have her children return home.

¶ 11      On October 12, 2021, Gateway staff diagnosed Aylissa with "Heroin use disorder, severe," "opioid dependence," and "Opioid use disorder, severe." Gateway recommended intensive outpatient treatment, stating that "client requires on-going engagement in an IOP setting to support abstinence efforts" and that "[f]requent clinical interventions [are] required multiple times a week to support gaining insight and enhancing motivation towards sobriety." Gateway opined that "[f]requent monitoring [is] required to reduce the risk of continuing harmful use."

¶ 12      An October 28, 2021, case management note from a Gateway clinician, Lernard Person, reflected that Aylissa said she "wanted to get into a detox after getting a referral from DCFS Agent." Person referred her to St. Anthony Hospital and advised if she could not get in there, she should go to any hospital emergency room and request a detox.

¶ 13      In the final case management note, dated November 4, 2021, Person recorded that Aylissa was discharged from Gateway as she "chose to check into detox at the advice of [an] outside agent." No other evidence at the adjudicatory hearing showed whether Aylissa received any subsequent substance abuse treatment.

¶ 14                          B. Testimony at the Adjudicatory Hearing

¶ 15      Lanese Kincaid-Turner, a DCFS investigator, testified that she spoke to Aylissa by telephone on October 7, 2020 regarding an incident with a man named Mark, in which her home was damaged. Aylissa called police and the minors were taken to the hospital. Following the incident, Aylissa and the children went to live with her sister. Kincaid-Turner did not do further investigation.

¶ 16    Officer Patrick Flynn of the Schiller Park Police Department testified that on October 15, 2021, he responded to the scene of a single vehicle accident where a car struck a tree. Aylissa was a passenger, but the minors were not in the vehicle. Aylissa told Flynn that the driver had stated that he was "tired of dealing with this s***" and "jerked the wheel hard to the right" before hitting the tree. She also relayed the driver had made suicidal comments. Aylissa was not charged in connection with that incident.

¶ 17    The State then called Natalie Erickson, DCFS child protection specialist. On or about August 30, 2021 she was assigned to investigate allegations of neglect of the minors, based on "concerns of [Aylissa] using drugs with [a] paramour."

¶ 18    Erickson visited Aylissa's residence on September 21, 2021, while the minors were present. She told Aylissa that there was a "concern of substance abuse." Aylissa told Erickson she was taking Norco, a prescription medicine for back pain. Erickson requested that Aylissa take a saliva drug test, which Erickson administered. Aylissa tested positive for opiates and cocaine.[3]

¶ 19    Erickson consulted her supervisor, and a "safety plan" was put in place for the minors. Erickson explained a safety plan is an agreement between a parent and DCFS in which the parent identifies someone with whom the minors can reside, pending the parent's completion of certain conditions. Under Aylissa's safety plan, she could not be unsupervised with the children or have overnight stays. The safety plan could be terminated if Aylissa had negative drug tests and "start[ed] substitute services." Erickson testified that later on September 21, 2021, Aylissa sent Erickson a text message. At that time, Aylissa said the Norco she previously mentioned was not

---

[3]The TASC records admitted at the hearing do not reference the September 21, 2021, drug test described by Erickson. However, the TASC records identify Erickson as the "contact person" with respect to three subsequent test results from samples collected on September 24, October 6, and October 21.

actually prescribed to her, but was actually from her "paramour." She said that her paramour obtained it from a dentist.

¶ 20    On September 24, Aylissa took another drug test and tested positive for opiates, cannabinoids, cocaine, and heroin. When Erickson telephoned Aylissa with the test results, Aylissa said that she smoked marijuana and "did cocaine [a] couple of days before our initial visit." She also suggested her ex-boyfriend, Mark, may have "put something in the marijuana." Erickson told Aylissa that in order to terminate the safety plan, she needed to begin substance abuse treatment and test negative for drug use.

¶ 21    On October 21, Erickson told Aylissa that a new safety plan participant needed to be identified to care for the minors because the initial plan participant could not continue. Aylissa identified a sister, but that person was not approved by DCFS to be a safety plan monitor. Aylissa then agreed for the minors to go to a program called Safe Families. However, when Safe Families staff reached out to Aylissa for her consent, she declined. Aylissa then suggested her godmother, but that person also was not approved. On October 25, Erickson took protective custody of the children, as there was "continued concern" about Aylissa's substance use and no one else was identified to care for the children.

¶ 22    On cross-examination, Erickson acknowledged that when she visited Aylissa and the minors' home on September 21, 2021, she performed a Child Endangerment Risk Assessment Protocol with a "safety threat identification" section. In that section, Erickson did not identify any threat of violence or sexual abuse or other "plausible threat of harm" to the children. She did not find that the children lacked "sufficient supervision," food, shelter, clothing, or medical care. The minors appeared to be healthy and properly dressed, had no visible marks or bruises, and showed a strong attachment to Aylissa. Erickson agreed that the only identified threat was the concern that

Aylissa was using drugs in the presence of the minors. Erickson agreed that there were no drugs in plain view in the home.

¶ 23 Erickson completed subsequent Child Endangerment Risk Assessment Protocols on September 27, October 4, and October 13, October 25, and October 27, 2021. On each of those dates, Erickson identified no other threats besides concern that Aylissa used drugs in the presence of the minors. Erickson never saw Aylissa using drugs in the presence of the minors, and she agreed that the minors always appeared healthy and appropriately dressed.

¶ 24 In closing argument, the State emphasized evidence of Aylissa's drug use and asked for findings of neglect due to injurious environment. Aylissa's counsel argued there was no evidence that the minors had been harmed or "affected in any way" by her alleged drug use. Her counsel argued that drug use, absent any nexus between the drug use and some harm to the child, is insufficient as a matter of law to support findings of abuse or neglect.

¶ 25 The trial court found the minors neglected due to an injurious environment, noting the parties had stipulated to the "validity and the proper performance of the drug tests" and their accuracy. The court remarked that it was concerned by the "daily drug use, heavy drug use, continued drug use as the mother seems to have been undergoing."

¶ 26 C. Dispositional Hearing

¶ 27 The court proceeded to a dispositional hearing regarding the minors. DCFS caseworker Loren Anthony testified that the minors had been in a safe and appropriate foster home since late October 2021. Aylissa had not seen the children since they were placed in the foster home. According to Anthony, Aylissa failed to appear for numerous scheduled appointments and drug tests. Anthony testified that, in January 2022, Aylissa told her that she was still "trying to wean herself off of heroin."

¶ 28    At the conclusion of the dispositional hearing, the court found that it was in the best interest of both minors that they be made wards of the court. On May 10, 2022, the court entered orders finding Aylissa unable to care for the minors and placing them in custody of DCFS guardianship administrator with the right to place the minors.

¶ 29    On June 9, 2022, Aylissa filed a notice of appeal, indicating that she wished to challenge the adjudication orders as well as the disposition orders for both minors.

¶ 30                    II. ANALYSIS

¶ 31    On appeal, Aylissa asserts several arguments, all of which are directed to the court's adjudication order finding that the minors were neglected due to an injurious environment under section 2-3(1)(b) of the Act. First, she argues that, as a matter of law, the State must show more than the mere existence of parental drug use in order to support a finding of neglect due to injurious environment. That is, she claims that the State must show that drug use had an adverse impact on the minors' environment. She asserts her position is supported by section 2-18(2)(f) and (g) of the Act, which specifies certain circumstances in which a parent's drug use can be deemed *prima facie* evidence of neglect. 705 ILCS 405/2-18(2)(f), (g) (West 2020). According to Aylissa, those provisions indicate that parental drug use alone is not sufficient to prove neglect. In a related argument, Aylissa claims that the findings of neglect were against the manifest weight of the evidence because the State failed to show such additional evidence.

¶ 32    Aylissa separately raises a number of constitutional challenges. She claims that the injurious environment provision in section 2-3(1)(b), in conjunction with section 2-18(2)(f), were unconstitutional "as applied" to her. She separately asserts that section 2-3(1)(b) is unconstitutionally vague "as applied" to her because "simple drug use that does not impact a parent's kids in any way is in no way proscribed by" that provision. Alternatively, Aylissa contends

that the drug test evidence was obtained in violation of her constitutional right to privacy and should not have been admitted. Finally, she raises an argument that section 2-18(2)(f) of the Act is void for vagueness.

¶ 33    Both the State and the Public Guardian (on behalf of the minors) have filed briefs requesting that we affirm. For the following reasons, we find that Aylissa's contentions are without merit and affirm the trial court's orders.

¶ 34                        A. Proceedings Under the Juvenile Court Act

¶ 35    In proceedings under the Act, the paramount consideration is the best interests of the child. *In re Z.L.*, 2021 IL 126931, ¶ 58 (citing *In re A.P.*, 2012 IL 113875, ¶ 18). " '[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances.' " *Id.* (quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)).

¶ 36    Under the Act, the trial court employs a "two-step process" in determining whether a minor should be removed from parental custody and made a ward of the court. *Id*. The first step is the adjudicatory hearing, at which "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2020). " 'The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful.' " *In re Z.L.*, 2021 IL 126931, ¶ 59 (quoting *In re Arthur H.*, 212 Ill. 2d at 467). At the adjudicatory hearing, it is the State's "burden to prove allegations of abuse or neglect by a preponderance of the evidence." *Id*. ¶ 61; *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 37    "If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing." *In re Z.L.*, 2021 IL 126931, ¶ 60. At the dispositional hearing, the court determines "whether it is consistent with the health,

safety, and best interest of the minor and the public that the minor be made a ward of the court." *Id.* (citing 705 ILCS 405/2-21(2) (West 2018)).

¶ 38  In this appeal, Aylissa's arguments are directed to the findings of neglect at the adjudicatory hearing. Section 2-3(1) of the Act defines the circumstances under which a minor can be found "neglected." 705 ILCS 405/2-3 (West 2020). Here, the trial court found the minors neglected pursuant to section 2-3(1)(b) of the Act, under which "neglected" persons include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." *Id.*

¶ 39  B. Whether Drug Use May Support A Finding of An Injurious Environment

¶ 40  We turn to Aylissa's contention that, as a matter of law, the State needed to prove more than parental drug use to support a finding of neglect due to injurious environment. She argues that the findings of neglect cannot stand because the State did not show any evidence that her drug use had an adverse impact on the minors' environment. In making this argument, she directs our attention to section 2-18(2)(f) and (g) of the Act, which specifies certain circumstances in which a parent's drug use can be *prima facie* evidence of neglect. According to Aylissa, these provisions convey that the mere fact of parental drug use is *not* sufficient to prove neglect, absent additional evidence of the effects of the drugs either on the parent or how the drugs at issue "ordinarily" affect users. For the following reasons, we disagree.

¶ 41  "[T]he term 'injurious environment' has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citations.]" *In re Arthur H.*, 212 Ill. 2d at 463. "In general, however, the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 42    Aylissa relies largely on *Arthur H.* to argue that there must be a showing of harm to the minor, not merely findings of parental conduct (*i.e.*, drug use), to support a finding of neglect due to injurious environment. As explained below, we find Aylissa's reliance on *Arthur H.* is misguided.

¶ 43    In *Arthur H.*, our supreme court emphasized that the function of the court at the adjudicatory hearing is to determine whether a child is neglected, not to assess which adult is to blame. *Id.* at 465 (rejecting as "contrary to the provisions of the Juvenile Court Act" the appellate court's reasoning that in order to find a minor neglected "both parents, or all persons responsible for the welfare of the minor, must engage in acts or omissions that constitute neglect"). *Arthur H.* explained:

> "[T]he purpose of an adjudication hearing is 'to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.' 705 ILCS 405/1-3(1) (West 2000). The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected. The legislature made no mention in this provision that *** the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of blame with respect to such individuals. [Citations.]
>
> In addition, in defining a neglected child in section 2-3 of the Act, the legislature focused exclusively upon the status of the child, and gave no consideration to an evaluation of the acts and/or

omissions of the child's parents *** in arriving at a determination of neglect. [Citation.]" *Id.* at 465-66.

¶ 44        *Arthur H.* proceeded to note that

"pursuant to section 2-21, the circuit court is first to determine whether the minor is neglected. There is no direction from the legislature that the court shall consider the actions of the parents in making this determination. It is only *after* the circuit court has adjudicated the child neglected that the statute directs the court to consider the actions of the parents. Even then, however, section 2-21 provides that the court need consider such actions only 'to the extent possible.' The plain language of this provision indicates that the legislature recognized that there may occur circumstances when a child is neglected, but it may be impossible to determine the relative fault with respect to the child's parents or guardians. However, even if such a determination is not possible, the statute is clear that this does not alter the finding that a child is 'neglected.' " (Emphasis in original.) *Id.* at 466-67.

¶ 45        Aylissa relies largely on the foregoing language from *Arthur H.* to argue that parental conduct alone cannot support a finding of neglect due to injurious environment, without additional evidence of an impact on the minor. Aylissa's interpretation of *Arthur H.* is incorrect and inconsistent with precedent regarding the meaning of an "injurious environment."

¶ 46        To be sure, *Arthur H.* held that a finding that a minor is neglected due to injurious environment does not require the court to apportion blame or fault among parents or guardians. *Id.*

However, this does not mean that parental conduct cannot support a finding of injurious environment. Nor does our precedent require proof of actual harm to a minor to sustain such a finding.

¶ 47        Although the focus of the inquiry at an adjudicatory hearing is whether the "minors are neglected, not whether the parents are neglectful" (*In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 36), that does not mean that the court disregards parental conduct in deciding whether there was an injurious environment. Indeed, "the term 'injurious environment' has been interpreted to include *the breach of a parent's duty* to ensure a 'safe and nurturing shelter' for his or her children." (Emphasis added.) *Id.* ¶ 40 (quoting *In re N.B.*, 191 Ill. 2d at 346); see also *In re John Paul J.*, 343 Ill. App. 3d 865, 879 (2003) ("neglect is the failure to exercise the care justly demanded by the circumstances and encompasses both willful and unintentional disregard of parental duties"). Clearly, parental conduct may be considered in assessing whether a parent has breached his or her duty to provide a safe environment.

¶ 48        Similarly, we are not convinced by Aylissa's argument that parental drug use is insufficient to find injurious environment, absent some additional showing that the drug use had an actual negative impact on the child's conditions. In essence, Aylissa suggests that the court could not find her drug use created an injurious environment for her children, absent a showing that they were actually harmed by it in some way.

¶ 49        We disagree, as our precedent makes clear that a finding of an "injurious environment" does *not* require a showing of actual harm. In other words, courts need not wait for a child to get hurt.

        "[O]ur courts have repeatedly emphasized that the statutory provisions *** require simply 'an injurious *environment* or substantial *risk* of harm' in order to sufficiently support a

finding of neglect or abuse and, once this has been found, the trial court need not wait until the child becomes a victim or is permanently emotionally damaged to remove her ***. [Citations.]" (Emphases in original and internal quotation marks omitted.) *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35.

¶ 50 Evidence that a parent exposed a child to a risk of danger is sufficient, even if the child has not yet been harmed by the danger. For example, this court affirmed a finding of neglect due to injurious environment where the minors' mother allowed her boyfriend to reside with them, where the boyfriend had a history of abusing his own child and a "bad temper." *In re M.K.*, 271 Ill. App. 3d at 827. The court found the boyfriend's "presence in their home created an environment injurious to their welfare" despite the fact that "there was no evidence that [minors] had actually been harmed." *Id.*

¶ 51 Similarly, in *In re Jordyn L.*, this court upheld a finding of neglect due to injurious environment, notwithstanding that the minor was a "healthy and nourished child who has not been injured or harmed." 2016 IL App (1st) 150956, ¶ 39. We emphasized that the fact that the child was healthy "does not mean that [the minor] is not neglected and abused." *Id.* We explained that respondent, the minor's mother, placed the child in the care of respondent's mother and grandmother, who themselves had a long-documented history of neglecting and abusing respondent and her siblings. *Id.* ¶ 40 ("Despite her very own experience, and ignoring over a decade of neglect and abuse, respondent has repeatedly chosen to leave her infant daughter in Charletta and Antoinette's homes, a choice that is clearly very dangerous.").

¶ 52 Such cases illustrate that an injurious environment may be found based on parental conduct that poses a risk, even if a child has not yet suffered any harm. In light of the foregoing, we cannot

agree with Aylissa's suggestions that drug use is not legally sufficient to support a finding of neglect due to injurious environment.

¶ 53    C. Section 2-18(2)(f) of the Act Is Irrelevant and Does Not Support Aylissa's Argument

¶ 54    In a separate argument in support of her position that her drug use was legally insufficient to support the injurious environment findings, Aylissa directs our attention to section 2-18(2)(f) of the Act.[4] That section provides that

> "proof that a parent, custodian or guardian of a minor repeatedly used a drug, to the extent that it has or would ordinarily have the effect of producing in the user a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality, shall be prima facie evidence of neglect." 705 ILCS 405/2-18(2)(f) (West 2020).

¶ 55    Aylissa acknowledges that this provision was *not* mentioned by the State or the court at the adjudicatory hearing. Nevertheless, she asserts that it is part of the "statutory scheme" at issue in this case. She proceeds to argue that the State did not satisfy its requirements. That is, she avers that, under section 2-18(2)(f), the State was required to prove not only that she repeatedly used drugs, but also that the drugs "ha[d] or would ordinarily have a substantial effect on the parent who used it." She thus claims the State's proof was legally insufficient, as the State did not elicit evidence about the impact of drug use on Aylissa or "what the effect of those drugs 'ordinarily' would have been."

---

[4]At times, Aylissa's brief erroneously refers to "Section 2-18(1)(f)" although the content of her argument makes clear she intends to refer to section 2-18(2)(f) of the Act.

¶ 56     This argument is flawed for a simple reason: it confuses the specific proof necessary to establish *prima facie* evidence of neglect under section 2-18(2)(f), with the level of proof generally necessary for State to prove an injurious environment. They are not the same thing, and the *prima facie* evidence provision in section 2-18(2)(f) was never implicated in this case.

Under section 2-18(2), proof of various enumerated circumstances "shall constitute *prima facie* evidence of abuse or neglect." *Id*. § 2-18(2). A number of the listed circumstances relate to parental drug or alcohol use, including proof that a minor is diagnosed at birth with narcotics withdrawal symptoms; proof that a parent or guardian of a minor "repeatedly used a drug to the extent that it has or would ordinarily have the effect of producing in the user a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation or incompetence, or a substantial impairment of judgment, or a substantial manifestation of irrationality"; proof that a parent "repeatedly used a controlled substance *** in the presence of the minor or a sibling of the minor"; or proof that a newborn infant's blood, urine, or meconium contain any amount of a controlled substance. *Id*. § 2-18(c), (d), (f), (g), (h). Such *prima facie* evidence gives rise to a rebuttable presumption of abuse or neglect. See *In re K.G.*, 288 Ill. App. 3d 728, 736 (1997) ("But even where *prima facie* evidence of abuse or neglect is presented, it creates only a rebuttable presumption that may be overcome by the introduction of other evidence. [Citations.]").

¶ 57     Aylissa's argument erroneously assumes that because the State relied on evidence of parental drug use to support a finding of neglect, it was *also* required to elicit specific proof of a *prima facie* evidence of neglect under section 2-18(f). There is no support for that position in the Act. Instead, section 2-18(2) simply sets forth a number of specific circumstances in which the State *may* seek to establish *prima facie* evidence of neglect; if it does so, it creates a presumption of neglect that may be rebutted by other evidence. Thus, if the State elicits proof of repeated

parental drug use "to the extent that it has or would ordinarily have the effect of" causing stupor, intoxication, or one of the other conditions listed in section 2-18(f)(2), the State has made a *prima facie* case of abuse or neglect. 705 ILCS 405 2-18(2)(f) (West 2020). Yet, nothing in section 2-18(2)(f) or the other provisions of the Act suggests that the State must *always* elicit such specific *prima facie* proof in order to obtain a finding of neglect due to injurious environment.

¶ 58    This is consistent with our supreme court's recognition that an injurious environment is an "amorphous concept that cannot be defined with particularly" and that such cases "must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. It is well-settled that the State's burden is simply to prove neglect by "a preponderance of the evidence," meaning that it "must establish that the allegations of neglect are more probably true than not." *Id.* at 463-64. There is no support for Aylissa's suggestion that the State needed to present evidence sufficient to establish a *prima facie* evidence of neglect within the meaning of section 2-18(2)(f) before the court could find that the minors were exposed to an injurious environment pursuant to section 2-3(1)(b).

¶ 59    On this point, Aylissa cites *In re D.A.*, 2022 IL App (2d) 210676. However, that decision does not support her argument. In that case, the State alleged that the minor's environment was injurious to his welfare, in part because he tested positive at birth for tetrahydrocannabinol (THC). *Id.* ¶ 3. At the adjudication hearing, a caseworker testified that both parents used marijuana daily but also acknowledged that TCH is legal and that there " 'really is not enough evidence to show how it affects babies.' " *Id.* ¶ 5. The Second District found that the State did not establish neglect by a preponderance of the evidence, as it "did not meet its burden of proving that D.A. was born with THC in his system or that the use of marijuana during pregnancy poses risks to the unborn child." *Id.* ¶ 15. The Second District further observed that "[t]he trial court appeared to invoke

section 2-18(2)(f) of the Act to support its conclusion that the environment was injurious to D.A's welfare." *Id.* ¶ 16. After reciting that statutory provision, the court noted that "[n]o evidence was offered at the adjudicatory hearing to show that respondent's current use of cannabis produced any condition described in section 2-18(2)f)." *Id.*

¶ 60    Aylissa cites *In re D.A.* to argue that the State is *always* required to elicit proof of the effect of the drugs at issue to prove neglect. Yet, *In re D.A.* made no such suggestion. That decision simply observed that, to the extent that trial court "appeared to invoke section 2-18(2)(f)," the State had not elicited evidence that the use of cannabis would cause intoxication or any other of the conditions listed in section 2-18(2)(f). *Id.*

¶ 61    Simply put, there is no support for Aylissa's position that the State needed to produce the *prima facie* evidence described in section 2-18(2)(f) of the Act in order for the court to ultimately find that the State had proven an injurious environment by a preponderance of the evidence. Moreover, section 2-18(2)(f) was never referenced or relied on by the State or the court during the adjudication proceedings. Thus, that statute is simply irrelevant to our review of the court's adjudication orders.[5]

¶ 62    D. The Trial Court's Injurious Environmental Finds Were Not Against the Manifest Weight of the Evidence

---

[5]Aylissa briefly mentions that Erickson did not notice drugs at her residence, in arguing that the evidence was insufficient to find an injurious environment. We recognize that under section 2-18(2)(g) of the Act, proof that a parent "repeatedly used a controlled substance *** in the presence of" a minor is "prima facie evidence of neglect." 705 ILCS 405/2-18(2)(g) (West 2020). Yet, as is the case with respect to section 2-18(2)(f), this does not mean that such evidence is *required* for the court to find an injurious environment. In any event, neither the State nor the trial court suggested that it was relying on section 2-18(2)(g)of the Act.

¶ 63    We turn to Aylissa's related contention that the findings of neglect were "against the manifest weight of the evidence on a factual basis," which is derived from her prior arguments. That is, she posits that "[b]ecause a finding of neglect based on a parent's drug use requires some form of additional evidence *** a trial court finding simply that a parent used drugs is insufficient to factually sustain" a finding of neglect. She suggests that, because the trial court did not hear specific evidence about the effects of the drugs on herself, evidence that she used drugs in the minors' presence, or evidence that her drug use had a "negative impact" on the minors, there was an insufficient "factual basis" to support the court's findings of neglect due to injurious environment. This argument is without merit.

¶ 64    We reiterate that neglect cases are "*sui generis*, and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463; see also *In re A.P.*, 2012 IL 113875, ¶ 24 ("where neglect is alleged, each case is to be decided on its particular facts"). Our supreme court has repeatedly emphasized the " 'fact-driven nature of neglect and injurious environment rulings.' " (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 17 (quoting *Arthur H.*, 212 Ill. 2d at 463). We also reiterate that while the term "injurious environment" is an " 'amorphous concept that cannot be defined with particularity,' " the term " 'has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children.' " (Internal quotation marks omitted.) *Id.* ¶ 22 (quoting *Arthur H.*, 212 Ill. 2d at 463).

¶ 65    The deferential standard of review is well-settled. "On review, a trial court's finding of neglect will not be reversed unless it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. [Citation.]" *Id.* ¶ 17; *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 66     We reject Aylissa's contention that the court's findings of neglect were against the manifest weight of the evidence. First, her argument presumes (incorrectly) that the trial court could not rely on her drug use to find an injurious environment, without some additional evidence of a "negative impact on her kids" or proof that would otherwise constitute *prima facie* evidence of neglect under section 2-18(2)(f) or (g). As already discussed, the court did not need to wait for the minors to be harmed before finding that they were exposed to an injurious environment. See *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35. Nor did the State need to elicit specific proof that the drugs Aylissa used would "ordinarily" cause a state of "stupor, unconsciousness, intoxication, hallucination" or other condition listed in section 2-18(2)(f), or that she used the drugs "in the presence of" the children pursuant to section 2-18(2)(g). As discussed, those provisions merely establish ways in which the State may seek to prove *prima facie* evidence of neglect. The Act does not require such specific evidence in order for the court to find that a minor's "environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020).

¶ 67     Moreover, given the uncontradicted documentary and testimonial evidence of Aylissa's drug use, we cannot say that the trial court's injurious environment findings were against the manifest weight of the evidence. This court has held that " '[a]lthough isolated incidents of a parent's drug usage do not necessarily pose a danger to a child [citation], *obviously an ongoing pattern of substance abuse can create an injurious environment*.' " (Emphasis added.) *In re K.E.-K.*, 2018 IL App (3d) 180026, ¶ 16 (quoting *In re Z.Z.*, 312 Ill. App. 3d 800, 805 (2000)). Similarly, a parent's failure to engage in services to address a substance abuse problem also supports a finding of an injurious environment. See, *e.g.*, *In re Sharena H.*, 366 Ill. App. 3d 405, 417 (2006) ("the trial court found that respondent's drug problem and inability/refusal to complete treatment caused

an injurious environment for Sharena; the court's finding was not against the manifest weight of the evidence").

¶ 68    Here, the State elicited detailed evidence showing an ongoing pattern of substance abuse. First, TASC records showed she tested positive on three occasions in September and October 2021 for several substances, including heroin, cocaine, and opiates. Perhaps more significant, Aylissa herself reported to Gateway that she used heroin on a daily basis for three months prior to October 8, 2021. Gateway diagnosed her with "[h]eroin use disorder, severe" and "opioid dependence" and believed her condition was serious enough to recommend intensive outpatient treatment. The trial court could certainly find that Aylissa's illegal drug abuse compromised the safety of her children, who were only two and five years old as of October 2021.

¶ 69    The trial court certainly find that the minors were subjected to an injurious environment. We certainly cannot say the "opposite conclusion was clearly evident" as would be necessary to reverse its findings. *In re Arthur H.*, 212 Ill. 2d at 464. Accordingly, we reject Aylissa's contentions that the findings of neglect were against the manifest weight of the evidence.

¶ 70        E. Aylissa Lacks Standing to Challenge the Constitutionality of Section 2-3(1(b) In

Combination With Section 2-18(f)(2)

¶ 71    We turn to the various constitutional arguments raised by Aylissa. None of them is convincing.

¶ 72    Her first constitutional argument attacks the combined application of two provisions of the Act already discussed: section 2-3-(1)(b)'s injurious environment provision, and section 2-18(f)(2), which specifies that proof of repeated parental drug use "to the extent that it has or would ordinarily have the effect of producing in the user a substantial state of stupor, unconsciousness, intoxication, hallucination, disorientation or incompetence, or a substantial impairment of

judgment, or a substantial manifestation of irrationality, shall be prima facie evidence of neglect." 705 ILCS 405/2-18(2)(f) (West 2020).

¶ 73    Aylissa asserts that this "statutory scheme" impermissibly infringes on parents' fundamental right to raise their children because it is not "narrowly tailored" and "includes groups of parents that it should not and omits groups of parents who are similarly situated to those it includes." She suggests that the statutory scheme is too "broad" because it encompasses parents whose drug use does not negatively impact their children. For example, she posits that a parent who uses hallucinogenic drugs at a festival or who drinks alcohol at a baseball game could be found to have "fulfilled a *prima facie* case of neglect" even if another responsible adult was watching the parent's child. Aylissa otherwise asserts that since many conditions besides drug use could cause a parent to be in a "stupor" or in one of the states of impairment listed in section 2-18(2)(f), such that statute "arbitrarily singles out a parent's drug use" and is not "narrowly tailored."

¶ 74    We do not assess the merits of these arguments. Aylissa's challenges to the "combination" of the injurious environment provision of section 2-3(1) and the *prima facie* evidence provision in section 2-18(2)(f) are not properly before us for a simple reason: the latter statute was never referenced or applied to prove neglect in this case. As Aylissa has not been impacted by that provision, she lacks standing to challenge it.

¶ 75    " 'The purpose of the doctrine of standing is to ensure that courts are deciding actual, specific controversies, and not abstract questions or moot issues." (Internal quotation marks omitted.) *In re M.I.*, 2013 IL 113776, ¶ 32. "In order to have standing to bring a constitutional challenge, a party must show that he is within the class aggrieved by the alleged unconstitutionality. [Citation.]" *Id.* Our supreme court has articulated the test as follows:

"In the absence of facts demonstrating an unconstitutional application of the statute, a person may not challenge the statute on the ground that it might conceivably be applied unconstitutionally in some hypothetical case. Rather a person must be directly or materially affected by the attacked provision and must be in immediate danger of sustaining a direct injury as a result of enforcement of the challenged statute. [Citation.]" (Internal quotation marks omitted.) *Id.*

¶ 76    Aylissa does not meet this test for standing, as section 2-18(2)(f) was never applied to her. As her brief concedes, that provision concerning *prima facie* evidence of neglect was never invoked by the State or applied by the court in the course of finding the minors neglected. Thus, Aylissa was not "directly or materially affected by the attacked provision." *Id.* In turn, her hypothetical arguments about ways in which section 2-18(2)(f) could be unconstitutionally applied (either alone or in combination with section 2-3(1)(b)'s injurious environment provision) amount to "abstract questions or moot issues" that are not proper for this court to discuss. (Internal quotation marks omitted.) *Id.* ¶ 32; see also *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) ("As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided. [Citations.]"). In turn, we decline to address these arguments due to lack of standing.

¶ 77        F. Aylissa's "As Applied" Vagueness Challenge to the Injurious Environment Statute

¶ 78    We next address Aylissa's contention that the Act's injurious environment provision, section 2-3(1)(b), is unconstitutionally vague "as applied" to her. That provision states that those

who are "neglected" under the Act include any minor "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020).

¶ 79    Aylissa recognizes that our supreme court recently held that the same provision is not unconstitutionally vague on its face. *In re Z.L.*, 2021 IL 126931, ¶¶ 88-91. Nevertheless, she claims that the injurious environment provision was unconstitutional *as applied* in her case, because "simple drug use that does not impact a parent's kids in any way is in no way proscribed by" section 2-3(1)(b). She argues that there are "countless parents" whose drug use "will never fall under the eye of DCFS precisely because such behavior is so common and does not invariably create a risk of harm to their children." She emphasizes that in her case there was "no indication that her kids have been negatively impacted at all" by her drug use, citing the testimony that the minors appeared to be healthy. Aylissa claims that the "sole reason" the minors were found to neglected "was because she had tested positive for drugs" and that section 2-3(1)(b) "does not adequately proscribe such conduct." Thus, she claims this provision is unconstitutionally vague as applied to her.

¶ 80    We note that Aylissa forfeited this argument because she failed to raise it below. See *id*. ¶ 88 (appellant forfeited challenge to section 2-3(1)(b) as unconstitutionally vague). Nevertheless, "given the fundamental liberty interest of a parent to raise and care for her children as protected by the United States Constitution [citation]," we may nonetheless address the merits of the constitutional challenge. *Id.* (overlooking forfeiture and proceeding to reject vagueness challenge to section 2-3(1)(b)). Even disregarding forfeiture, we find Aylissa's as applied challenge lacks merit.

¶ 81    "All statutes are presumed to be constitutional, and the burden of rebutting that presumption is on the party challenging the validity of the statute to demonstrate clearly a

constitutional violation." *People v. Wilson*, 214 Ill. 2d 394, 398-99 (2005). "Both facial and as-applied challenges face the same considerable burden of overcoming the strong judicial presumption that the statute at issue is constitutional. [Citation.]" *People v. Kelly*, 2018 IL App (1st) 162334, ¶ 20. "[A]ll as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶ 23.

¶ 82    "A vagueness challenge is a due process challenge, examining whether a statute give[s] [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." (Internal quotation marks omitted.) *People v. Greco*, 204 Ill. 2d 400, 415-16 (2003). " ' "[T]he test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." ' " *In re Z.L.*, 2021 126931, ¶ 90 (quoting *People v. Schoos*, 15 Ill. App. 3d 964, 966 (1973), quoting *Jordan v. De George*, 341 U.S. 223, 231-32 (1951)). "When considering a vagueness challenge to a statute, a court considers not only the language used, but also the legislative objective and the evil the statute is designed to remedy. [Citation.]" *Greco*, 204 Ill. 2d at 416.

¶ 83    As Aylissa recognizes, our supreme court in *In re Z.L.* rejected a request to declare that the injurious environment statute was "unconstitutionally vague." 2021 IL 126931, ¶ 88. In so doing, it approvingly cited *Schoos*, 15 Ill. App. 3d 964, in which "the appellate court rejected the specific arguments *** that the injurious environment category was unconstitutionally vague because it lacked adequate notice of what parental acts were proscribed and allowed selective and discriminatory enforcement by the State and the courts." *In re Z.L.*, 2021 126931, ¶ 90 (citing *Schoos*, 15 Ill. App. 3d at 965-66).

¶ 84    Our supreme court recognized that " 'Child neglect is by its very nature incapable of a precise and detailed definition ***.' " *Id.* (quoting *Schoos*, 15 Ill. App. 3d at 967). Our supreme

court reiterated that "the term 'injurious environment' cannot be defined with particularity," that allegations of neglect are *sui generis*, and that the "fact-driven nature of neglect and injurious environment rulings." (Internal quotation marks omitted.) *Id.* ¶ 89. Thus, *In re Z.L.* held that "the term injurious environment is not unconstitutionally vague." *Id.* ¶ 91.

¶ 85    Aylissa nevertheless asserts that the injurious environment provision is unconstitutionally vague *as applied* to her. She relies on the fact that the court's findings of neglect were premised on her drug use, despite the absence of evidence that "her kids had been negatively impacted at all." She reiterates Erickson's testimony that the children were properly dressed, that they appeared healthy, and that there was no evidence of drug use in the children's presence. In this sense, Aylissa's vagueness challenge essentially repeats her prior assertion that her drug use was legally insufficient to support findings of injurious environment, absent some additional proof of an actual negative impact on the children. However, as we have already discussed, a court may find an injurious environment based on the *risk of harm* to children created by parental conduct; the court need not wait until the minors suffer *actual harm*. See *In re Jordyn L.* 2016 IL App (1st) 150956, ¶ 35 (the Act's provisions "require simply 'an injurious *environment* or substantial *risk* of harm' in order to sufficiently support a finding of neglect or abuse and, once this has been found, the trial court need not wait the child become a victim" (emphases in original) (quoting *In re M.K.*, 271 Ill. App. 3d at 827)).

¶ 86    Moreover, we reject the suggestion that the section 2-3(1)(b) statute was too vague to apprise Aylissa that her conduct could support a finding of neglect due to injurious environment. The evidence showed that, on four occasions, she tested positive for heroin, cocaine and other substances. These were not isolated incidents, as Aylissa admitted she was using heroin on a daily basis for three months. Indeed, she was diagnosed with "Heroin use disorder, severe" and opioid

dependence. We emphasize that her children were only five and two years old at the time. Although the term " 'injurious environment' cannot be defined with particularity" (*In re Z.L.*, 2021 IL 126931, ¶ 89), a reasonable person could certainly understand that a parent's regular use of heroin could compromise the safety of such young children in the parent's care. That is, when applied to the facts of this case, the injurious environment provision of the Act "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." (Internal quotation marks omitted.) *Id.* ¶ 90.

¶ 87    We thus reject Aylissa's contention that section 2-3(1)(b) of the Act was unconstitutionally vague as applied to her.

¶ 88    G. Aylissa Forfeited Her Claim that the Drug Test Evidence Was Unconstitutionally Obtained and Its Admission Was Not Plain Error

¶ 89    We turn to Aylissa's argument that her constitutional rights, including her right to privacy, were violated when DCFS investigator Erickson came to her home and administered drug tests of her saliva. Aylissa asserts that "No evidence was ever admitted as to why [DCFS] did this" and that "Erickson's choices to prompt Aylissa to (1) allow Erickson into her home, and (2) take an oral saliva drug test, amount to an unconstitutional interference into Aylissa's privacy." She asserts "[t]his evidence should not have been admitted at adjudication," although she does not specify whether she is referring to the documentary evidence of drug test results contained in Exhibit 1, Erickson's testimony regarding the drug tests, or all such evidence.

¶ 90    Aylissa does not cite any Illinois state court authority discussing whether it is appropriate for DCFS staff to administer drug tests, or whether the results of such tests are admissible at an adjudicatory hearing. Rather, she generally cites to case law acknowledging the "fundamental right to privacy" with respect to family life (*McCluskey v. Clark Oil & Refining Corp.*, 147 Ill. App. 3d

822, 825-26 (1986)) and the confidentiality of medical information. She argues that "just as the Fourth Amendment of the U.S. Constitution protects people from unwarranted searches and seizures, the Fourteenth Amendment protects people from invasions into their private family life." She suggests that the drug tests administered by DCFS were akin to an unwarranted search in violation of the fourth amendment, citing *Florida v. J.L.*, 529 U.S. 266 (2000) (holding that anonymous tip reporting a person with a gun lacked sufficient indicia of reliability to justify police officer's stop and frisk of that person). She also directs us to a recent Pennsylvania decision holding that a report from an unidentified source does not establish probable cause under the fourth amendment to enter a home to investigate alleged child neglect. *Interest of Y.W.-B.*, 265 A.3d 602 (Penn. 2021). Aylissa asserts "DCFS did not have a [c]onstitutionally-valid reason to believe that Aylissa's kids were at risk of harm, so its intrusion into Aylissa's privacy was not justified."

¶ 91          This claim was not raised in the court below and is forfeited. Further, the record does not support a finding of "plain error" to excuse such forfeiture. Moreover, respondent's counsel affirmatively acquiesced to the admission of the drug test evidence. Thus, we reject Aylissa's argument concerning that evidence.

¶ 92          The record reflects that Aylissa never challenged admission of the DCFS-administered drug tests at the adjudication hearing or in a post-hearing motion. See *In re M.S.*, 2018 IL App (1st) 172659, ¶ 26 (in appeal from appointment of foster parents as guardian, natural mother failed to preserve claim of alleged *ex parte* conversation between trial judge and minor "by objecting at trial and filing a written posttrial motion addressing it"); *In re April C.*, 326 Ill. App. 3d 225, 242 (2001) ("Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the question for review and the issue is waived.").

¶ 93    We recognize that "we may relax the rules of forfeiture where an issue impacts the fundamental fairness of a proceeding and address it under the plain error rubric." *In re M.S.*, 2018 IL App (1st) 172659, ¶ 27 (citing *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30). "In civil cases, the plain error rule usually applies 'only where an act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." *In re M.S.*, 2018 IL App (1st) 172659, ¶ 27 (quoting *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007)). This court has stated that "the application of the plain error doctrine to civil cases should be exceedingly rare." *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶ 37.

¶ 94    In this case, we have no basis to conclude that there was any error, let alone plain error, with respect to the saliva drug tests administered by DCFS. Notably, the record contains no evidence to suggest that Aylissa did not consent to the administration of the drug tests. At the adjudication hearing, Erickson testified that she requested Aylissa to submit to a drug test on September 21, 2021, and that she administered that test on that date. However, Erickson was not explicitly asked (by Aylissa's counsel or anyone else) whether Aylissa consented to that or any other test. If Aylissa consented, she could not claim that the tests violated her fourth amendment rights. See *People v. Anthony*, 198 Ill. 2d 194, 202 (2001) ("[A] search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment.").

¶ 95    Moreover, even assuming that Aylissa could establish that the drug test evidence was improperly obtained and should not have been admitted, we would not find its admission was a "prejudicial" error, as is required to constitute a plain error. See *In re M.S.*, 2018 IL App (1st) 172659, ¶ 27 ("for plain error to apply, the error must be prejudicial; that is, the case must be a close one"); *Arient*, 2015 IL App (1st) 133969, ¶ 37 (plain error doctrine applies in civil cases

"only where the act complained of was a prejudicial error"). In this case, the drug test results were cumulative of other evidence, and so their admission was not prejudicial. See *In re M.S.*, 2018 IL App (1st) 172659, ¶ 28 (alleged *ex parte* conversation was not plain error "as it was merely cumulative of the evidence presented by multiple witnesses"). Here, in addition to the drug test results, the evidence included Gateway's records reflecting Aylissa reported that she used heroin on a daily basis for three months. Further, Gateway's records reflected that Aylissa was diagnosed with heroin use disorder and opioid dependence. Thus, even without the drug test results, there was ample evidence to support the trial court's findings of injurious environment. In turn, even the improper admission of the drug test results would not be prejudicial error.

¶ 96    Finally, we note the record reflects that Aylissa's counsel acquiesced to the admission of the drug test results. See *People v. Bush*, 214 Ill. 2d 318, 332-33 (2005) ("[W]hen a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, she cannot contest the admission on appeal. [Citations.] This is because, by acquiescing in rather than objecting to the admission of allegedly improper evidence, a defendant deprives the State of the opportunity to cure the alleged defect."). Aylissa's counsel stated there was ["n]o objection" to the admission of the TASC records that included the drug test results. And Aylissa's counsel did not object to Erickson's testimony regarding the drug tests. Indeed, when Erickson was asked to describe the process of administering the first test, Aylissa's counsel interjected: "For the sake of time *** I am willing to concede [the] validity and accuracy of the test that was performed." Her counsel then agreed to stipulate that "[t]hey were performed properly, results were as accurate as the test can be."

¶ 97    For the foregoing reasons, Aylissa's arguments concerning the drug test evidence are unavailing.

¶ 98        H. Aylissa Lacks Standing to Challenge Section 2-18(2)(f) as Void For Vagueness

¶ 99        Aylissa's final contention is that section 2-18(2)(f) of the Act is void for vagueness. Specifically, she focuses on the statutory phrase that proof of a parent's drug use "to the extent that it has *or would ordinarily have*" the effect of producing intoxication or one of the other enumerated states therein, is *prima facie* evidence of neglect. (Emphasis added.) 705 ILCS 405/2-18(2)(f) (West 2020). She claims the "or would ordinarily have" phrase does not convey sufficient warning as to the proscribed conduct, because "[a] parent cannot know that the ordinary effect of a specific drug use would be or even what an 'ordinary' person is."

¶ 100       As discussed with respect to her prior contention challenging this provision as an infringement of her right to parent, Aylissa also lacks standing to assert the instant argument. To have standing to challenge a statute, a person "must be directly or materially affected by the attacked provision." *In re M.I.*, 2013 IL 113776, ¶ 32. As noted, section 2-18(2)(f) was not referenced or relied upon by the court in finding the minors neglected. That is, the State never sought to establish *prima facie* evidence of neglect under this provision, and the court never made any such finding of *prima facie* evidence. The court found the minors were neglected due to an injurious environment pursuant to section 2-3(1)(b) of the Act, wholly independent of any application of section 2-18(2)(f). As section 2-18(2)(f) was never implicated in her case, Aylissa lacks standing to challenge this provision as unconstitutionally vague.

¶ 101                                III. CONCLUSION

¶ 102       In sum, we reject all of Aylissa's challenges to the adjudication orders finding the minors neglected due to an injurious environment. We also note that, although her notice of appeal indicated that she also sought to challenge the disposition orders entered for both minors, Aylissa's

briefing raises no contentions with respect to those orders. Thus, she has forfeited any challenge to the disposition orders. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 103      For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 104      Affirmed.

---

***In re K.F.*, 2023 IL App (1st) 220816**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 21-JA-1009-20; the Hon. Levander Smith Jr., Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Alex Stein, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A Plain and Christopher J. Williams, of counsel), for appellee. |