**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220463-U

Order filed March 24, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* A.C., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-22-0463 |
| | ) | Circuit No. 21-JA-44 |
| v. | ) | |
| | ) | |
| Rachel P., | ) | Honorable |
| | ) | Paula A. Gomora, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Holdridge and Justice Hettel concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Respondent was not denied her due process rights at the termination proceeding. Affirmed.

¶ 2     Respondent, Rachel P., appeals from the trial court's order finding that she was an unfit parent and that it was in the best interest of her minor child, A.C., that respondent's parental rights be terminated. For the reasons set forth below, we affirm.

## I. BACKGROUND

At issue in the underlying proceeding were respondent's parental rights as to K.C., born in February 2021; J.C., born in November 2019; and A.C., born in July 2016.[1] The case was initiated on February 17, 2021, when the State filed petitions for an adjudication of wardship based on neglect in that the children's environment was injurious to their welfare. Following a shelter-care hearing on February 18, 2021, based upon the parties' stipulation, the trial court entered an order finding probable cause to believe that the children were neglected due to an injurious environment and that there was an immediate and urgent necessity for protection of the children on the basis that respondent tested positive for cocaine at K.C.'s birth and that A.C. was born substance exposed. The trial court further found that it was in the best interest of the children that they be placed in shelter care. Respondent was granted frequent and liberal visitation. K.C. and J.C. were placed together in a foster home; A.C. was placed with her paternal grandmother.

### A. Adjudicatory Hearing

Prior to the adjudicatory hearing, at a May 10, 2021, proceeding, Kayla Vaughn, the assigned child welfare specialist, informed the trial court about an incident that had occurred at a recent supervised visitation with the children. Vaughn stated that respondent "made several inappropriate outbursts where she threatened me, she threatened to punch me in my face." Then, when Vaughn was "on the phone with the 911 operator, [respondent] jumped at me as if she was going to hit me. She called me a swear word. She kicked the elevator door. She refused to leave,

_____

[1] The parental rights of the children's biological father were terminated in the underlying proceeding; he is not a party to this appeal.

which prompted me to call the cops." Vaughn explained that this was "the third outburst" and that respondent had been present before the hearing but had an outburst in the waiting room and "stormed out." The trial court suspended respondent's visitation with the children until completion of a mental health evaluation and psychological evaluation if necessary.

¶ 7        The adjudicatory hearing proceeded on May 25, 2021, where the parties stipulated that K.C. and A.C. were born substance exposed and that respondent tested positive for cocaine at K.C.'s birth. Following the hearing, the trial court entered an order of adjudication, finding that the children were neglected in that their environment was injurious to their welfare on the basis of the facts to which the parties stipulated.

¶ 8                                    B. Dispositional Hearing

¶ 9        A dispositional hearing proceeded on June 22, 2021. Counsel for respondent requested a finding that respondent was "unable rather than unfit." Counsel explained that respondent completed a program at Silver Oaks Behavioral Health (Silver Oaks) but that there was some confusion with respect to respondent's discharge paperwork. Namely, it was reported that respondent was "unsuccessfully discharged," but respondent "said that she has met with them and they are revising their discharge summary." According to counsel, respondent "is engaged now with Restoring the Spirit" and was planning to obtain a mental health evaluation there so that she may resume visitation, was "anxious to see her children," and was willing to complete any other necessary services.

¶ 10       Following the hearing, the trial court entered its dispositional order, finding respondent unfit for reasons other than financial circumstances alone to care for, protect, train, or discipline the minors and that it was in the minors' best interest that they be made wards of the court. In its oral ruling, the trial court noted that the services set forth in respondent's service plan were

3

"inpatient and outpatient drug treatment which would be follow-up treatment, submitting to random drops, discontinuing use of illegal substances, attend NA/AA meetings, demonstrate adequate parenting skills during visitation, participate in a mental health assessment, be medication compliant, complete individual therapy, engage in anger management treatment or therapy, obtain adequate housing, obtain a legal source of income, stay in contact with the agency, and maintain frequent and consistent visitation following the mental health assessment." The trial court found that respondent needed to complete services outlined in her service plan, demonstrate the lessons learned from the services, and implement them into her daily life.

¶ 11 The trial court placed the minors in the custody and guardianship of the Department of Children and Family Services (DCFS) with the right to place the minors with a responsible relative or in traditional foster care. The trial court further found that, based upon the best interest of the minors, "appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness to care for, protect, train, or discipline the minors" and that DCFS has made reasonable efforts to facilitate the achievement of the permanency goal of return home. The trial court suspended respondent's visitation until such time as she obtained a mental health assessment and became compliant with any recommendations set forth therein. The case was continued for a permanency-review hearing.

¶ 12 Following the trial court's ruling, caseworker Vaughn informed the trial court that respondent had "said some racial things" toward Vaughn and stated that, going forward, respondent would therefore have to contact Vaughn through respondent's attorney or Vaughn's supervisor. The trial court inquired as to whether respondent's remarks would "bias your opinion in how you evaluate the case from here on." Vaughn responded that her opinion would remain

4

unbiased but that respondent had been "nasty" and "rude" from "Day One," respondent had "lashed out" at Vaughn several times, and Vaughn did not feel safe around respondent.

¶ 13    The trial court advised Vaughn that it "can't have you monitor the case and not have contact with the parents." Vaughn clarified that that "we have contact, but my supervisor lets me know what she needs." The trial court responded, "[T]hat isn't going to work because at some point in the future, if I need you to come in and testify regarding something, it's not going to be you because you have no personal knowledge of what is actually going on because you are not the one who is doing the follow-up." The trial court admonished that it would not tolerate racist remarks, that "you do not disrespect the caseworkers," and that respondent should contact her attorney to bring any motions to the court's attention.

¶ 14    At this point, respondent's counsel stated, "Your Honor, based on what the caseworker said, it does sound like there is some inability to be able to work with mother, feel safe around mother, so I would ask that a new caseworker be assigned." The trial court responded:

    "I'm not going to change caseworkers right now. If the situation does not improve—because here's the thing: If I change caseworkers now and the same behavior takes place with another caseworker, I will—I'm not going to continue doing this. I mean, caseworkers are busy. They get to learn, you know, the people who they are trying to serve and it's not fair to the agency and to the caseworkers to continually change them, and I'm not going to give you the upper hand that if you make particular comments, that you can expect that I'm going to change the caseworker. That isn't going to be the case."

¶ 15    Respondent's counsel replied, "Your Honor, that's specifically why I did not do a motion, but based on Miss Vaughn's statements in court, I am concerned that she—." The trial court interjected, "I will do it until September and then, you know, if the situation doesn't

improve or—or if there is, you know, lack of communication in some respects, then you can bring it to my attention before then. Respondent's counsel stated, "Okay," at which point the trial court advised, "I'm open to any motions. I'm just not going to do it now. I mean, the situation absolutely needs to improve." The trial court clarified, "Unless, Miss Vaughn, you request of your supervisor to have the caseworker changed. I mean, I have no control over who the caseworker is ***." Vaughn responded that, if there were no improvement, she would contact her supervisor and reiterated that respondent "has to be respectful and I have been respectful to her." The trial court replied, "I agree. I absolutely agree. So you need to start on a different foot starting today. Starting right this second. Because the failure to do that just demonstrates to me that there is an underlying difficulty."

¶ 16       At the conclusion of the dispositional hearing, the trial court advised respondent that "this is the first time during the course of these proceedings that you have the ability to appeal any of my court's orders." The trial court further advised respondent that she had 30 days to file a motion to reconsider any of its orders and, if the motion were denied, 30 days from the date of the denial to file a notice of appeal. Respondent neither moved to reconsider nor appealed from the dispositional order.

¶ 17                        C. Motion to Terminate Parental Rights

¶ 18       Following permanency-review hearings on September 29, 2021, March 23, 2022, and September 13, 2022, the trial court found that respondent had not made reasonable efforts or progress toward the permanency goal. Meanwhile, on May 17, 2022, the State filed motions to terminate respondent's parental rights, alleging that respondent was unfit on three grounds:  (1) failure to maintain a reasonable degree of interest, concern and responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failure to make reasonable efforts to correct the

6

conditions that were the basis for the children's removal during the nine-month time period of May 25, 2021, through February 25, 2022 (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) failure to make reasonable progress towards the return of the children within nine months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). On June 28, 2022, the trial court entered an order changing the goal to substitute care pending court determination on termination of parental rights.

¶ 19                                    1. Unfitness Hearing

¶ 20        The unfitness hearing proceeded on September 23, 2022. Both Vaughn and respondent testified at the hearing.

¶ 21        Vaughn testified that the minors came into care because K.C. was born with cocaine and THC in his system. Previously, A.C. had been born with cocaine in her system. Respondent acknowledged to DCFS that she had a history of substance abuse.

¶ 22        Vaughn authored the family's service plans and testified regarding the service goals outlined for respondent. The goals included to comply with an integrated assessment, complete a substance abuse treatment program along with aftercare, engage in psychotherapy and parenting classes, provide proof of housing and employment, be medication compliant, and attend an anger management and domestic violence partner intervention abuse program.

¶ 23        Vaughn testified that the only service that respondent had successfully completed and provided proof of was parenting classes. While Vaughn testified that responded had not completed *any* services prior to the adjudicatory hearing, Vaughn acknowledged a letter from Easter Seals stating that respondent had completed the parenting classes approximately a month before the adjudicatory hearing.

7

¶ 24      Vaughn also acknowledged that respondent had initially engaged in a substance abuse treatment program at Silver Oaks prior to the adjudicatory hearing. However, Vaughn testified that respondent did not successfully complete the program and was involuntarily terminated from the program for failure to appear. Vaughn further acknowledged that the initial discharge summary stated that respondent was discharged for not progressing but that an addendum to the discharge summary provided that respondent had received the maximum benefit from the intensive outpatient programming and recommended individual therapy. Vaughn testified that she contacted the counselor regarding the discrepancy and that the counselor responded in an e-mail that respondent did not complete the program and that the agency could not offer additional services due to respondent's failure to appear.

¶ 25      Regarding the remaining services, Vaughn testified that she referred respondent to a counselor for psychotherapy, but respondent did not respond to the counselor's calls and certified letters. Vaughn also referred respondent to a clinician for a mental health evaluation. The clinician called and wrote respondent, but respondent never contacted the clinician to schedule the evaluation. Vaughn also prepared a letter with an access code and phone number to dial in for an evaluation, drove to respondent's last known address, and put the letter under her door. However, respondent failed to respond.

¶ 26      Vaughn also testified that the trial court had suspended respondent's visitation in May 2021 until she obtained a mental health evaluation. As a result, respondent had no visitation during the initial nine-month time period after adjudication. Respondent obtained a psychiatric evaluation in March 2022, at which point visitation resumed and continued until June 2022. According to Vaughn, it did not appear that respondent bonded with the children during the visits. During those same months, responded attended but did not complete a domestic violence

8

and anger management program. Vaughn further testified that the agency subsequently suspended visitation because respondent's outbursts had increased and that, to date, visitation had not resumed.

¶ 27    In addition, Vaughn testified that respondent never provided proof of employment or suitable housing. However, Vaughn acknowledged that she had never been in respondent's home and could not state whether it was suitable. Vaughn testified that respondent had informed her that she lived in a two-bedroom home with her adult daughter and her daughter's boyfriend and was planning to move. And finally, Vaughn testified that respondent had failed to appear for several random drug screenings but acknowledged that she had appeared for at least 10, some of which were positive for THC, and none of which were positive for cocaine or any other illegal substances.

¶ 28    Respondent testified regarding her service plan goals. She completed parenting classes in April 2021 and then attended a program at Silver Oaks from April 19, 2021, to May 6, 2021. Respondent explained that she was discharged a day early from the program because she was taking care of her mother who was dying of cancer. She was referred to Restoring the Spirit for individual therapy, completed the first part of the assessment there, but did not complete the second part of the assessment because her mother passed away. Respondent explained that, at this point, she became depressed and acknowledged that she did not pursue services for a period of time. However, respondent obtained a psychiatric evaluation in March 2022, was prescribed Prozac for depression, and takes the medication as needed. Respondent testified that she intends to schedule a follow-up appointment with the psychiatrist.

¶ 29    Respondent further testified that, in March 2021, she began to attend AA meetings twice a week, obtained a sponsor, talked to her sponsor two to three times a week on the phone, and

met with her sponsor once a week. At the time of her testimony, it had been a month since respondent talked to her sponsor.

¶ 30    Respondent explained that she attended a domestic violence and anger management program but was unable to continue because the hours of her new job conflicted with the program's hours. As a result, she was terminated from the program. Respondent testified that she talked to Vaughn about finding a new provider, but Vaughn never provided a referral. Respondent also testified that Vaughn told her that anger management was part of the services she had received in the substance abuse treatment program at Silver Oaks. Thus, respondent disagreed that she had not completed anger management counseling as outlined in the service plan.

¶ 31    Regarding her housing, respondent testified that she requested an in-home inspection visit "around Easter time in 2021" because she wanted to initiate in-home visitation with the children and wanted to give the children Easter baskets. Respondent testified that Vaughn refused and told respondent that she could not see her children on Easter. Respondent testified that, on another occasion, she requested an in-home inspection but that Vaughn refused due to respondent's outburst during recent visitation with the children. Respondent acknowledged that she told Vaughn that she was moving but had "[n]o concrete plans."

¶ 32    Respondent testified regarding the presence of caregivers at her visits with the children. Respondent had requested that they leave the room after a few minutes because their presence prevented her from bonding with the children. Respondent testified that she was not given a reason for the suspension of visitation in June 2022.

¶ 33    With respect to the random drug screenings, respondent explained that she missed some because she had started a new job and could not leave. Respondent sent text messages to Vaughn

and requested earlier notice because of her job but Vaughn explained that "they are random drops, so that she really couldn't give me any type of notice." Respondent also testified that she told Vaughn that she had transportation difficulties because she did not have a driver's license but that Vaughn did not offer a bus pass or transportation information. Regarding proof of employment, respondent thought that she had provided Vaughn with a copy of her first paystub and noted that she had worn her work uniform and badge during visitation with the children. Respondent acknowledged that she was not currently employed. Following testimony, the trial court continued the case for submission of written closing arguments and decision.

¶ 34 The trial court issued its decision on October 24, 2022. In its written order, the trial court found, by clear and convincing evidence, that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2020)), and failure to make reasonable progress toward the return of the children within nine months after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)).[2]

¶ 35 In its oral findings, the trial court noted that it had suspended visitation on May 10, 2021, until such time as respondent obtained a mental health assessment, "due to her angry outbursts both at the agency, as well as during visitation." However, respondent did not complete the evaluation until March 2022. Thus, respondent had no visitation with the children for

---

[2] It is unclear from the record whether the trial court also found respondent unit for failure to make reasonable efforts to correct the conditions that were the basis for the children's removal from the nine-month time period of May 25, 2021, through February 25, 2022 (750 ILCS 50/1(D)(m)(i) (West 2020)).

11

approximately 10 months. The trial court also found that respondent maintained no contact with caseworker Vaughn from August 2021 through November 2021.

¶ 36    In addition, the trial court found that respondent had completed the integrated assessment, substance abuse assessment, and parenting education. However, she failed to complete individual counseling, a mental health evaluation, and a psychiatric assessment, and failed to provide proof of medication compliance, domestic violence counseling, or anger management counseling. Respondent also failed to maintain regular and consistent visitation with the children because her visits were suspended during this entire time period for failure to complete the mental health assessment.

¶ 37    The trial court noted that, despite respondent's claims that she could not continue domestic violence or anger management counseling at the initial referral due to her employment, respondent failed to provide proof of employment or stable income during this time period. The trial court further noted that the testimony established that respondent did not allow an inspection of her residence, stating that she was planning to move, but that respondent never moved. Respondent lived in a two-bedroom residence with her daughter and daughter's boyfriend and the residence was not suitable for the addition of the three minor children.

¶ 38    And finally, the trial court found that respondent "failed to consistently participate in random drops to establish historical sobriety, which was crucial, given that both [A.C.] and [K.C.] were born substance exposed to cocaine." In sum, the trial court found that, "[b]ecause of [respondent's] failure to complete the majority of the recommended services, as well as the failure to maintain visitation for a period of ten months, the Court finds [respondent] to be unfit within the meaning of the adoption statute." The trial court scheduled the matter for a best-interest hearing.

12

¶ 39                                    2. Best-Interest Hearing

¶ 40        The best-interest hearing proceeded on November 22, 2022. Caseworker Vaughn and the

foster parents testified. A.C. had been placed with her paternal grandmother; J.C. and K.C. had

been placed together in a foster home. Vaughn testified that the children were not placed together

because the paternal grandmother was unable to take all three children given that she was 69

years old. However, the siblings visited each other regularly and in excess of the visitations

scheduled by the agency. Vaughn testified regarding the children's relationships with their foster

parents and her opinion that, if the children were available for adoption, it would be in their best

interest to be adopted by their foster parents (including the parental grandmother). The foster

parents testified to their respective relationships with the children, their ability to care for the

children, and their intention to adopt the children if the children became available for adoption.

¶ 41        Following closing arguments, the trial court found that the State had proven, by a

preponderance of the evidence, that it was in the best interest of the children to terminate

respondent's parental rights and to grant DCFS the authority to consent to their adoption.

Accordingly, the trial court entered an order terminating respondent's parental rights.

¶ 42        Respondent timely appealed.

¶ 43                                        II. ANALYSIS

¶ 44        The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) sets forth a

two-step process for the involuntary termination of parental rights. *In re M.I.*, 2016 IL 120232,

¶ 20; 705 ILCS 405/2-29(2) (West 2020). Initially, the State must establish, by clear and

convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of

the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West

2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State

13

must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). We will not disturb a trial court's findings with respect to parental unfitness or the child's best interest unless the findings are against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence. *Id.* ¶ 30.

¶ 45        While respondent purports to challenge the unfitness ruling on appeal, she does not articulate an argument that the trial court's findings were against the manifest weight of the evidence. Rather, respondent contends that the termination hearing violated her due process rights. According to respondent, the trial court improperly relied upon the biased testimony of caseworker Vaughn in finding respondent unfit. We disagree, as set forth below. Initially, however, we address our jurisdiction. The State argues that respondent is essentially challenging the trial court's denial of her motion to remove Vaughn as the assigned caseworker. This motion was made and denied at the dispositional hearing, following which the trial court entered its dispositional order.

¶ 46        A dispositional order is a final and appealable order. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). Thus, as the trial court admonished at the conclusion of the dispositional hearing, respondent was required to file a motion to reconsider or notice of appeal within 30 days of the dispositional order. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Respondent did neither. Accordingly, the State argues that this court lacks jurisdiction to review respondent's claim on appeal. See *In re Janira T.*, 368 Ill. App. 3d 883, 891 (2006) (reviewing court lacked jurisdiction

14

over the respondent's claim of insufficient evidence of abuse or neglect at the adjudicatory hearing because the respondent did not appeal from the dispositional order).

¶ 47    However, respondent is appealing the order terminating her parental rights, not the dispositional order. It is undisputed that she timely appealed the termination order. Respondent's claim is that she was denied her due process rights at the termination proceeding on the basis of Vaughn's biased testimony. Thus, we have jurisdiction to review respondent's claim.

¶ 48    Nonetheless, respondent forfeited the claim by failing to raise the issue in the underlying termination proceeding. Indeed, the record reflects that the only time respondent challenged Vaughn's assignment to the case was at the dispositional hearing, notwithstanding that the trial court explicitly advised at that time to bring the matter to its attention if the situation did not improve and that it was "open to any motions." Respondent never reiterated the matter with the trial court nor filed any motion regarding Vaughn's impartiality or assignment as her caseworker.

¶ 49    However, respondent argues that we should address her due process claim under the plain error doctrine because the failure to assign a new caseworker seriously affected the fairness of the termination proceeding and challenged the integrity of the judicial process. We will consider the issue for plain error. See *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11 ("[S]ince termination of parental rights affects a fundamental liberty interest, we will consider the [pleading defect] issue for plain error.").

¶ 50    That being said, a review of the record demonstrates that there was no error, much less prejudicial error warranting reversal. See *In re M.S.*, 2018 IL App (1st) 172659, ¶ 27 (the plain error rule generally applies in civil cases only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and subsequently impaired the integrity of the judicial process). To begin, respondent does not

15

pinpoint the error at the heart of her plain error assertion. As noted, she never filed a motion to remove the caseworker or raised the issue at the termination proceeding. Thus, there is no ruling that respondent challenges in this regard. Rather, respondent argues that her "due process rights were violated when the trial court did not assign a new caseworker after her current caseworker [] stated she was unable to work with [respondent]."

¶ 51    The State responds that Vaughn's continued assignment to the case does not provide a basis for reversal of the subsequent order terminating her parental rights. In support, the State cites *In re C.M.M.*, 2022 IL App (5th) 210420-U, ¶¶ 47-48, in which the appellate court held, *inter alia*, that the trial court did abuse its discretion in denying the respondent's motion to remove a caseworker. Initially, the appellate court rejected the argument that the denial of the motion could provide a basis to reverse the termination of respondent's parental rights, noting that, "where a DCFS caseworker fails to perform DCFS's statutory obligations, three potential remedies exist: (1) removal of the guardian, (2) a *mandamus* action to compel performance, and (3) contempt proceedings. *Id.* ¶ 47 (citing *In re K.C.*, 325 Ill. App. 3d 771, 778 (2001)).

¶ 52    With respect to removal of the guardian, the appellate court pointed out that the Act provides that the trial court *may* remove a guardian and appoint another. *Id.* (citing 705 ILCS 405/2-28(1) (West 2020)). In other words, removal is in the sound discretion of the trial court. *Id.* Holding that denial of the motion to remove was not an abuse of discretion, the appellate court reasoned that, while "[a] review of the entire record in this case undoubtedly reveals some failures on the part of [the caseworker]," at the time of the ruling, the only evidence presented to the trial court was contradictory testimony regarding the reasons for respondent's missed visitation with the minors and whether there had been a lack of communication. *Id.* ¶ 48. It was

16

within the province of the trial court to resolve conflicts in the evidence and make determinations regarding witness credibility. *Id.*

¶ 53 Of course, here, while the principles set forth in *In re C.M.M.* certainly support the exercise of the trial court's discretion below, the issue presented in this case is not whether the trial court abused its discretion in denying counsel's request for assignment of a new caseworker. Rather, as respondent argues, "[w]hile the trial court failed to remove the caseworker at the [] dispositional hearing, [respondent] may still argue that failure to remove the caseworker [] denied her due process rights at the termination hearing due to the bias[ed] testimony from the caseworker to which she is now seeking review of in this appeal." We turn to this argument.

¶ 54 The crux of respondent's claim is that Vaughn's testimony did not support the trial court's order to terminate respondent's parental rights because she was biased against respondent. As evidence of this bias, respondent relies upon various portions of Vaughn's testimony. For instance, respondent cites the impeachment of Vaughn's testimony that respondent had not completed any services prior to the adjudicatory hearing. Contrary to her testimony, the evidence established that respondent had in fact completed parenting classes and engaged in a substance abuse treatment program prior to the adjudicatory hearing. According to respondent, Vaughn's testimony further reflects that she never considered respondent's participation in AA meetings and meetings with her sponsor as part of her individual therapy in the service plan and never addressed respondent's conflicting work schedule and transportation issues.

¶ 55 In addition, respondent notes Vaughn's testimony that she received an e-mail from a counselor stating that respondent did not complete the substance abuse program and that the agency could not offer additional services due to respondent's failure to appear. However,

17

respondent points out, the e-mail was not introduced into evidence. And respondent testified that she was released from the program to help care for her dying mother. Likewise, respondent notes that, while Vaughn testified that certain letters were sent to respondent by certified mail, the return receipts were not admitted into evidence.

¶ 56 Further, respondent argues that Vaughn was incorrect about the precise number of drug drops completed by respondent. And, finally, citing Vaughn's testimony that the caregivers were present at visitation, respondent contends that the evidence reflected that Vaughn "interfered or otherwise took steps which prevented [respondent] from bonding with her children during visitation."

¶ 57 Respondent's arguments are essentially challenges to the factual findings and credibility determinations involved in the trial court's determination of parental unfitness. We note that the trial court is in the best position to make these assessments, given its superior position to view and evaluate the parties. See *M.I.*, 2016 IL 120232, ¶ 21 ("A finding of unfitness will not be reversed unless it is against the manifest weight of the evidence *** [because] the trial court's opportunity to view and evaluate the parties *** is superior to that of a reviewing court.") (Internal quotations marks omitted.); *In re Ay.D.*, 2020 IL App (3d) 200056, ¶ 55 ("A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make.").

¶ 58 The trial court explicitly found, by clear and convincing evidence, that respondent was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare and for failure to make reasonable progress toward the return of the children within nine months after the adjudication of neglect. In so finding, we note that the trial court carefully considered the evidence and even resolved some of the discrepancies in the testimony

to which respondent cites in respondent's favor. A review of the entire record reflects that the trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 59 The trial court found that respondent had completed the integrated assessment, substance abuse assessment, and parenting education. However, she failed to complete individual counseling, a mental health evaluation, and a psychiatric assessment, and failed to provide proof of medication compliance, domestic violence counseling, or anger management counseling. Respondent also failed to maintain regular and consistent visitation with the children. Namely, the trial court noted that it had suspended visitation on May 10, 2021, until such time as respondent obtained a mental health assessment, "due to her angry outbursts both at the agency, as well as during visitation." However, respondent did not complete the evaluation until March 2022. Thus, respondent had no visitation with the children for approximately 10 months. The trial court also found that respondent maintained no contact with caseworker Vaughn during a four-month time period.

¶ 60 The trial court further noted that, despite respondent's claims that she could not continue domestic violence or anger management counseling at the initial referral due to her employment, respondent failed to provide proof of employment or stable income during this time period. Moreover, the trial court found that respondent "failed to consistently participate in random drops to establish historical sobriety, which was crucial, given that both [A.C.] and [K.C.] were born substance exposed to cocaine."

¶ 61 In sum, the trial court found respondent unfit due to her failure to complete the majority of the recommended services and failure to maintain visitation for a 10-month time period. Respondent does not address these findings and raises no persuasive basis upon which to hold that the trial court's finding of unfitness was against the manifest weight of the evidence.

19

Accordingly, we rejected respondent's argument that the termination proceeding violated her due process rights.

¶ 62                                    III. CONCLUSION

¶ 63          For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

¶ 64          Affirmed.